## SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

## CREDIT BANCORP, LTD., Credit Bancorp, Inc., Richard Jonathan Blech, Thomas Michael Rittweger and Douglas C. Brandon, Defendants.

### No. 99 CIV. 11395(RWS).

United States District Court, S.D. New York.

Aug. 21, 2003.

---

Golenbock, Eiseman, Assor, Bell & Peskoe, New York, By David J. Eiseman, Esq., Of Counsel, for Carl H. Loewenson, Jr., Esq., Court-appointed Receiver for Credit Bancorp, Ltd. and affiliated entities.

Davis, Polk & Wardwell, New York, By James H.R. Windels, Of Counsel, for Intervenor Deutsche Bank Securities, Inc.

Wollmuth Maher & Deutsch LLP, New York, By Frederick R. Kessler, Of Counsel, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, OK, By T. Lane Wilson, Of Counsel, for Intervenor Stephenson Equity Company.

## OPINION

SWEET, District Judge.

Carl H. Loewenson Jr. Esq., as Court-appointed Receiver (the "Receiver") for Credit Bancorp, Ltd. and affiliated entities (individually and collectively, "CBL") has moved for an order (1) directing Deutsche Bank Securities, Inc. ("DBSI") and DB Alex Brown LLC ("DBAB") (collectively, "Deutsche Bank") to transfer the custody of the Receiver all assets transferred after August 11, 1999 into accounts maintained at Deutsche Bank in the name of CBL, (2) declaring unsecured all margin loans extended by Deutsche Bank after August 1999, in such accounts, as well as all interest that has accrued on such loans, and (3) directing Deutsche Bank to credit to an account designated by the Receiver certain proceeds realized from the tender of shares of Praegitzer Industries, Inc. ("Praegitzer").

Intervenor Deutsche Bank[1] moves simultaneously for (1) a declaration of the validity of its security interest in the 2,400,000 shares of Vintage Petroleum, Inc. ("Vintage") stock in the accounts of CBL at Deutsche Bank; and (2) authorization to sell the Vintage shares to satisfy the approximately $17.4 million in CBL's outstanding margin loans and interest, plus collection costs.

Intervenor Stephenson Equity Company ("SECO")[2] moves simultaneously with the Receiver and with Deutsche Bank for an order (1) directing Deutsche Bank to transfer to the custody of the Receiver all assets transferred into the CBL accounts after December 1, 1998, (2) declaring unsecured all margin loans extended by Deutsche Bank in the CBL accounts after December 1, 1998, as well as all interest that has accrued on such loans, and (3) directing Deutsche Bank to credit to the CBL accounts the proceeds previously received in connection with the tender offer of the Praegitzer shares.

For the following reasons, the motion of the Receiver is granted in part, the motion of Deutsche Bank is denied, and the motion of SECO is granted in part and denied in part.

## PRIOR PROCEEDINGS

This action was initiated on November 17, 1999 by the plaintiff, the Securities and Exchange Commission (the "SEC"), to freeze the assets of CBL upon the allegations that Richard Jonathan Blech ("Blech") and others had engaged in a complicated securities fraud. The fraud, which was in effect a Ponzi scheme, affected over 200 customers with interests exceeding $200 million. An equity receivership was established on January 21, 2000.

Certain of the prior proceedings are described in previous opinions of this Court, familiarity with which is presumed. The following is a partial list of opinions of relevance to the present motion: *SEC v. Credit Bancorp, Ltd.*, 2002 WL 1792053, (S.D.N.Y. Aug.2, 2002) (*"Credit Bancorp V"*); *SEC v. Credit Bancorp, Ltd.*, 2001 WL 1658200, (S.D.N.Y. Dec.27, 2001) (*"Credit Bancorp IV"*); *SEC v. Credit Bancorp, Ltd.*, 2000 WL 1752979 (S.D.N.Y. Nov.29, 2000) (*"Credit Bancorp III"*); *SEC v. Credit Bancorp, Ltd.*, 124 F.Supp.2d 824 (S.D.N.Y.2000) (*"Credit Bancorp II"*); *SEC v. Credit Bancorp, Ltd.*, 194 F.R.D. 457 (S.D.N.Y.2000) (*"Credit Bancorp I"*). In addition, the Second Circuit has issued two opinions in the case: *SEC v. Credit Bancorp, Ltd.*, 297 F.3d 127 (2d Cir.2002) (*"CBL II"*) and *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80 (2d Cir.2002) (*"CBL I"*).

Deutsche Bank moved on April 11, 2003 for an order declaring the validity of its security interest and for leave to sell its Vintage shares. The Receiver moved on April 14, 2003 for an order transferring certain securities to the Receiver, declaring certain of Deutsche Bank's margin loans unsecured, and directing Deutsche Bank to credit certain proceeds to an account designated by the Receiver. On May 2, 2003, SECO cross-moved for an order invalidating Deutsche Bank's asserted lien on assets held in CBL accounts and responding to the motions by Deutsche Bank and the Receiver. The Receiver submitted a brief in opposition to Deutsche Bank's motion and in further support of the Receiver's motion. Deutsche Bank

---

**1.** The Court granted Deutsche Bank's motion for permissive intervention on November 29, 2000. *See SEC v. Credit Bancorp, Ltd.*, 2000 WL 1752979, at *32 (S.D.N.Y. Nov.29, 2000).

**2.** The Court granted SECO's motion for permissive intervention on March 21, 2000. *See SEC v. Credit Bancorp, Ltd.*, 194 F.R.D. 457, 468–69 (S.D.N.Y.2000).

submitted a brief on May 16, 2003 in opposition to the motions of the Receiver and SECO with respect to Deutsche Bank's liens. On June 20, 2003 the Court heard the testimony of Reindert Houben ("Houben"), who was an employee of Deutsche Bank at all times relevant to this motion. The Court heard the testimony of Blech on June 23, 2003, followed by oral argument on the motion. At that time the motion was deemed fully submitted.

## FACTS

As part of its illegal activities, CBL wrongfully deposited customer-owned securities in its own name held by a variety of securities broker/dealers, including Deutsche Bank. The broker/dealers, including Deutsche Bank, then made margin loans to CBL, using as collateral the securities deposited in the accounts of the broker/dealers.

### CBL's Margin Account at Deutsche Bank

In the summer of 1998, CBL approached Deutsche Bank and opened several accounts in which it deposited and traded securities. These accounts originated in the Geneva, Switzerland office of BT Alex. Brown ("BTAB"), Deutsche Bank's predecessor, through a BTAB broker named Reindert Houben. Houben had been contacted by a CBL trader named Basil Shoukry, whom Houben had met previously when Shoukry had applied for a position in the Geneva office of BTAB. One of the accounts opened by CBL at Deutsche Bank was a margin account in which CBL purchased securities using margin loans provided by Deutsche Bank (the "CBL Account.")

On September 15, 1998, Blech, on behalf of CBL, signed a margin agreement with Deutsche Bank which granted Deutsche Bank a security interest in all of the securities held in the CBL Account. The margin agreement granted Deutsche Bank discretion to sell "any or all" of the securities in the account, as selected by Deutsche Bank in its discretion, in order to satisfy CBL's margin debts. Windels Declaration Exhibit 2, ¶ 10. CBL further agreed "to pay the reasonable costs and expenses of collection" of its indebtedness "including any reasonable attorney's fees and costs." Id., ¶ 9.

After Deutsche Bank AG acquired Bankers Trust and its affiliates in June 1999, Deutsche Bank requested that customers of BTAB authorize the transfer of their accounts to Deutsche Bank Securities, Inc. CBL authorized the transfer of the CBL Account in a form executed on June 15, 1999, and signed a new customer agreement, governed by New York law.

The agreement granted Deutsche Bank a lien on all assets in CBL's accounts at Deutsche Bank and the discretion to select securities to be liquidated to enforce the security interest. See Windels Decl. Exh. 4 ¶ 3. CBL again agreed to reimburse Deutsche Bank for the "reasonable costs or expenses of collection of any debit balance and any unpaid deficiency in any of [its] accounts, including but not limited to attorneys' fees incurred and payable or paid by [Deutsche Bank]." Id., ¶ 6.

The account documents completed by Houben with respect to the CBL Account state that the CBL Account did not contain the assets of a third party. Houben testified that he took steps to assure himself the that the assets being traded by CBL belonged to CBL and not to third parties. Eiseman Decl. Exh. 50 at 140–41.

Houben also visited CBL's offices in Geneva, where he met with Blech. Houben testified that his observations of CBL's offices and his discussions with Blech were entirely consistent with his understanding that CBL was an investment vehicle exclusively for Blech's family. On a note which

Houben alleges he wrote around the time he was first introduced to CBL, Houben notes that Blech "manages his own + father's money" and "*not* money on behalf of clients." Eiseman Decl. Exh. 4 (emphasis in original); Exh. 50 at 296–97. Blech, however, testified that he never told Houben that any of CBL's assets came from his father's wealth. (6/23/03 Tr. at 129–130).

**The DCH Shares**

On October 7, 1998, CBL transferred five DCH Technology ("DCH") share certificates into its account at CBL, representing 450,000 shares. *See* Windels Supp. Decl. Exh. 1. The share certificates stated that CBL was the "record holder" of the shares and were marked "Restricted," presumably under Rule 144.[3] *Id.* Because the shares were marked restricted, Deutsche Bank classified them in CBL's account as Type 1, *i.e.,* Deutsche Bank would not view the shares as reliable collateral for margin loans to CBL because there was a risk that they could not be sold easily. *See* Windels Supp. Decl. Exh. 2; Hoddinott Dep. at 64–65.

On November 16, 1998, CBL faxed a letter to Houben and Keith Cummins, one of Houben's sales assistants, requesting them to deliver from the CBL Account the "five restricted DCH Technology certificates to the transfer agent with the instruction that they are to be re-registered in the name of Oxford International" and, following re-registration, returned to CBL at its offices in Toms River, New Jersey. Eiseman Decl. Exh. 19, at DB 1843. No evidence has been presented as to what Oxford is, or identifying Oxford's relationship, if any, to DCH, CBL, or the Blech

family. The letter was provided to Gail Rosen, another of Houben's sales assistants, to process. *Id.* at DB 1843–444; Exh. 50 at 231, 243.

Rosen conveyed Blech's request to BTAB's Restricted Securities Transfer Department, which undertook, as an initial matter, to assure itself that the re-registration requested by Blech was not inconsistent with the shares' restrictions. *See* Eiseman Decl. Exh. 20, at DB 2968–73. Accordingly, on December 9, 1998, a BTAB employee faxed a letter to DCH's transfer agent, Holladay Stock Transfer ("Holladay"), enclosing Blech's November 16 letter and requesting authorization for "the transfer of 450,000 shares as requested by our customer." Eiseman Decl. Exh. 21; Eiseman Decl. Exh. 20, at DB 2965.

After receiving BTAB's December 9 fax requesting authorization to re-register the shares, DCH's transfer agent, Holladay, telephoned BTAB and notified the firm that there was an obstacle to re-registering the shares. The Holladay representative explained to BTAB that on November 10 and 11, 1998, prior to Blech's letter requesting re-registration, DCH's president, William Firestone, had written to Holladay to request that Holladay cancel the certificates that CBL wished to re-register. *See* Eiseman Decl. Exh. 21. According to Firestone, the shares had been issued to Oxford in or around August 1998, but Oxford had still not paid for them. *Id.*

Handwritten notes from an unknown author produced by Deutsche Bank reflect that conversation: "Tom @ Holiday [*sic*] Stock ... Adverse Claim Against Customer B/C Shares were not fully pd. for ... Company will not give clearance." Eise-

---

**3.** SEC Rule 144 sets out a series of conditions that must be met before a person may legally sell "restricted securities." Restricted securities include securities acquired directly or indirectly from the issuer in a transaction not involving any public offering. The conditions include a minimum holding period for the shares, along with limitations on the amount of securities sold and the manner of sale. *See* 17 C.F.R. § 230.144.

man Decl. Exh. 20 at DB 2961–62. The information was then conveyed to other BTAB personnel, who noted: "Adverse claim against customer . . . shares not fully paid for + co. (DCH) will not render any opinion or give any clearance for transfer . . . reject back to from the agent . . . Oxford not pd . . . tr. in dispute." Eiseman Decl. Exh. 19, at DB 1842.

No direct evidence has been provided that indicates whether or when anyone from BTAB notified CBL of the cancellation order issued by DCH. Houben testified that he has no recollection of the matter. *See* Eiseman Decl. Exh. 50 at 241–50; 528–35. However, on December 15, 1998, CBL sent another letter indicating that Oxford had "failed to meet its payment obligations" for the shares and that they should be returned to the transfer agent and reissued in DCH's name. *See* Eiseman Decl. Exh. 19 at DB 1841 (letter from Richard J. Blech to Reindert Houben and Keith Cummins, dated Dec. 15, 1998). BTAB passed CBL's changed instruction on to the transfer agent, and the transfer agent confirmed that "[a]s per DCH company instructions, on December 18, 1998, Holladay Stock Transfer has cancelled [the] 450,000 shares." Eiseman Decl. Exh. 20, at DB 2960.

In response to these instructions from CBL and the transfer agent, Deutsche Bank's back office in Baltimore returned the shares to the transfer agent. Accordingly, the next account statement marked the shares as "confiscated" by the transfer agent. Eiseman Decl. Exh. 10. The designation of "confiscated" allowed Deutsche Bank to remove the shares from its books and close out the transaction. The designation indicated that the shares had been sent to the transfer agent and would not be returned to Deutsche Bank.

## The Praegitzer Letters

On November 30, 1998, approximately two months after the opening of the CBL Account, Blech faxed a one-page letter to BTAB's Becky Epperly. At the time, Epperly was an intermediate clerk in BTAB's Settlement Services Department, located in Timonium, Maryland. Epperly Dep. at 6–7. Epperly processed all "free deliveries" of securities, *i.e.*, transfers of securities between a BTAB account and an account at another brokerage firm, and all "DWAC" transfers, *i.e.*, transfers of securities from an issuer's transfer agent into a BTAB account or vice versa. Eiseman Decl. Exh. 55 at 26, 28–30. Epperly was the person at BTAB who directly handled such transactions.

Blech's letter (the "Blech Letter"), written on CBL letterhead, notified Epperly that "we have been advised by Chase Mellon that 200,000 shares of Praegitzer Industries (PGTZ) CUSIP 739422103 are ready for delivery into our above referenced account via DWAC." The letter went on to request that Epperly "arrange to accept delivery on [CBL's] behalf." Eiseman Decl. Exh. 16. Blech copied Houben on the letter, and Houben testified that he received it and forward it to his assistant. Houben Dep. at 399; Eiseman Decl. Exh. 16.

On December 1, 1998, the next day, Praegitzer Industries ("Praegitzer") faxed to Epperly another letter regarding the DWAC transfer from Chase Mellon of 200,000 shares of Praegitzer Industries stock. Eiseman Decl. Exh. 17 & 18. The letter (the "Praegitzer Letter"), signed on behalf of Praegitzer by Scott Gilbert, Vice President of Finance and Treasurer, stated in reference to the share transfer:

> Because the shares are held by Mr. Praegitzer, who is the Chief Executive Officer, Chairman of the Board, and principal shareholder of Praegitzer In-

dustries, Inc., the Shares, represented by stock certificate without legend, can generally only be sold pursuant to the provisions of Rule 144 under the Securities Act of 1933 and your records should so indicate.

*Id.* Deutsche Bank did not produce a copy of the Praegitzer Letter to the Receiver and has asserted that it was not in Deutsche Bank's files.

Epperly did not recall receiving or reviewing either the Blech or the Praegitzer Letters. *See* Eiseman Decl. Exh. 47 at 22–23, 31. She testified that she received, on average, approximately 500 requests per day to process free delivery and DWAC transfers and does not recall the specific transactions she processed. *Id.* at 11–12, 22–23, 31. Epperly's supervisor, Deborah Rowe, does not recall either letter. *See* Eiseman Decl. Exh. 54 at 16. Nor, in turn, does Rowe's supervisor, James Sheaf. *See* Eiseman Decl. Exh. 55 at 71, 78–79.

Houben testified that he did not recall the specific circumstances surrounding receipt of the Blech Letter and that, in any case, during his involvement with CBL, no information was brought to his attention that would have caused him to be concerned that securities belonging to someone other than CBL were being transferred into the CBL Account. *See* Eiseman Decl. Exh. 50 at 398–99, 527. Houben was not asked about the Praegitzer Letter.

BTAB accepted delivery of the 200,000 shares of Praegitzer stock into the CBL Account, but the shares appear to have gone into a sub-account other than the designated one. The Blech Letter states that the shares are "ready for delivery into our [CBL's] above referenced account," which is "601 25666–1 5." Eiseman Decl. Exh. 16. Sheaf testified that "the second 1 . . . represents a cash account" and thus

the Blech Letter indicates that the Praegitzer shares were to be transferred into a Type 1, or cash account. Despite the terms of the Blech Letter, the Praegitzer shares were placed into CBL's Type 2, or margin account. *See* Eiseman Decl. Exh. 9; Exh. 49 at 68. No evidence has been presented as to who at Deutsche Bank was responsible for moving the Praegitzer shares from the cash account to the margin account. Doing so, however, increased the collateral on which Deutsche Bank was willing to extend margin loans to CBL.

**Transfer of Vintage Shares into CBL Account**

On June 21, 1999, SECO instructed its broker, Merrill Lynch, to transfer two million shares of Vintage stock into the CBL Account as a "free delivery" through the DTC electronic book-entry system. *See* Windels Decl. Exh. 7; *Credit Bancorp III*, 2000 WL 1752979, at *6. At the same time, CBL instructed Deutsche Bank to accept the Vintage shares from Merrill Lynch. *See* Windels Decl. Exh. 8. The Second Circuit held that through "the documents executed by SECO to transfer its Vintage shares in fact and in law accomplished an outright transfer of share ownership from SECO to CBL." *CBL I*, 290 F.3d at 87.

The Vintage shares that SECO transferred to CBL were restricted pursuant to Rule 144. Nonetheless, SECO failed to provide any notice of restrictions on ownership or transfer of the Vintage shares when instructing Merrill Lynch to transfer the shares to CBL via the DTC. *See* Windels Decl. Exh. 7.

The electronic transfer of the Vintage shares through the DTC could not have occurred if DTC had notice of the restrictions. Restricted shares—other than certain securities eligible for transfer pursuant to SEC Rule 144A—were not eligible for electronic transfer in the summer of

1999. Shares transferred via the DTC electronic system were presumed to be non-restricted.

Shares in the custody of the DTC, and thus eligible for electronic transfer among the financial institutions that are DTC participants, had to be free of adverse claims. *See* DTC Services Guide § B000 ("By depositing a certificate at DTC, Participants warrant and represent to DTC that . . . the certificates are in good deliverable form . . .").

**The Tasin Account**

CBL also opened an account with Tasin & Co. (the "Tasin Account.") for which Deutsche Bank provided settlement services. Tasin, with which CBL had opened a brokerage account in or about June 1998, has previously used Oppenheimer & Co. ("Oppenheimer") as its clearing firm. *See* Eiseman Decl. Exh. 56 at 17–19. In September 1999, each Tasin customer account, and the assets credited and margin balance debited to each such account, were transferred from Oppenheimer to Deutsche Bank. *See* Eiseman Decl. Exh. 49 at 140. This included the Tasin Account.

On September 24, 1999, CBL and Deutsche Bank entered into a correspondent customer margin agreement related to the Tasin Account, which permitted CBL to borrow on margin in the account. *See* Windels Decl. Exh. 15. The terms of the Tasin margin agreement were similar in all material respects to the terms of the margin agreement for the CBL Account and granted Deutsche Bank a security interest in all of the securities held in the Tasin Account. The Tasin margin agreement is governed by Maryland Law. *Id.,* ¶ 17.

At the time the agreement was signed, CBL's account at Tasin already held 400,-000 shares of Vintage stock, as well as the securities of various other issuers. *See*

Windels Decl. Exh. 16. These shares were apparently owned by CBL.

**The Margin Loans**

Under Deutsche Bank's procedures in effect at the time, initial responsibility for margin lending lay with the broker assigned to the account—in this case, Houben for the CBL Account and Tasin & Co. for the Tasin Account. Once a customer's loan balance exceeded $500,000, the customer was required to apply for a credit line beyond this amount from Deutsche Bank's credit department. The credit department reviewed a credit line request form filled out by the broker and determined, by assessing a number of factors, whether to grant the request.

In making its decision, the credit department focused on the quality, diversification, liquidity and price volatility of the securities serving as collateral. All securities deposited in a Type 2 account were considered as collateral, no matter when they were deposited. The credit department sought to ensure that Deutsche Bank could sell sufficient securities in order to repay the margin loans. Deutsche Bank maintains that it extended loans only to the extent that they were secured by collateral.

As CBL increased its borrowing from Deutsche Bank, it periodically requested and received credit line extensions. On October 27, 1998, Deutsche Bank's credit department approved a $1.4 million credit line for CBL in the CBL Account. *See* Windels Decl. Exh. 18. Thereafter, CBL requested a number of increases in its credit line, which Deutsche Bank granted after internal review. *See* Windels Decl. Exh. 18. Deutsche Bank similarly approved increases in the credit line of the Tasin Account on two occasions—in October 1999 and November 1999. *See* Windels Decl. Exh. 21.

On several occasions, Deutsche Bank did not increase the credit line to the full extent requested by CBL. *See* Windels Decl. Exh. 19–20.

Deutsche Bank maintains that in approving credit line increases for both the CBL Account and the Tasin Account, it followed its customary credit department procedures. Most of the credit line increases were handled by Thomas Hoddinott, the Vice President of Credit for DBAB. Hoddinott has testified that his approvals were based on the fact that the CBL Account and the Tasin Account were "not very highly leveraged to the value of the overall collateral, and there were many securities in that collateral." Hoddinott Deposition at 62. Deutsche Bank's credit department also conducted Dun & Bradstreet and Lexis–Nexis searches into CBL's credit history, in particular looking for "negative" credit information such as bankruptcies or tax liens. *Id.* at 98, 169–70, 176–77, 210–11. Deutsche Bank maintains that no such negative information about CBL was uncovered. Hoddinott also testified that "none of the securities in the account that we were looking at to determine a loan had any kind of restriction according to . . . the listing of the securities in the account." *Id.* at 247–48. Hoddinott contends that he was not aware of any restricted securities held as collateral in the margin accounts. *Id.* at 257.

In the two accounts together, CBL borrowed on margin over $21 million. As of March 31, 2003, CBL's margin debt, with interest included, was approximately $17.4 million. *See* Windels Decl. Exh. 30. The reduction in the margin debt is primarily attributable to the tendering by Deutsche Bank of shares of Praegitzer stock from both the CBL and Tasin accounts, as described below.

## World Wide Wireless Communications

According to CBL account records, 2,650,000 World Wide Wireless Communications ("WWW") shares were physically transferred to Deutsche Bank and credited to the CBL cash account on July 29, 1999. *See* Eiseman Decl. Exh. 26, at DB 512 and Exh. 35. CBL began selling shares WWW in three transactions in early August: 100,000 on August 5, 1999, another 100,000 on August 6, 75,000 on August 9, and 8,000 on August 12. *See* Eiseman Decl. Exh. 27, at DB 492.

## The WWW Letter

On August 11, 1999, Paul Manasian, a lawyer representing WWW, sent a letter to Deutsche Bank, notifying the firm of WWW's interest in, and of restrictions on, the WWW shares held in the CBL Account. *See* Eiseman Decl. Exh. 31. The letter (the "WWW Letter"), which was addressed to Timothy J. Caffrey, a Deutsche Bank Managing Director, concerned the "2,650,000 shares of WWC [World Wide Wireless Communications] stock" that had been "recently deposited with Deutsche Banc Alex Brown by a company named Credit Bancorp." *See* Eiseman Decl. Exh. 31. The letter further stated:

> The shares in question were pledged as collateral for a loan to be made by CBL to Worldwide Wireless, Inc. ("WWI"), which is a shareholder of WWC. Pursuant to the terms of the Credit Facility Agreement between CBL and WWI, a trustee, Douglas Brandon, was appointed to hold the pledged shares. The shares were originally in certificated form and bore a restricted legend on the back indicating that the shares were subject to certain restrictions under Section 5 of the 1993 [*sic*] Securities Act, as amended, and Rule 144 promulgated thereunder. At the request of CBL those shares were reissued by WWC

without the restrictive legend, only on the express understanding that the trustee under the Credit Facility Agreement would undertake to inform any prospective purchasers of the shares of the restriction applicable to the shares.

*Id.* The letter also emphasized that "[t]here has been no default by WWI under the Credit Facility Agreement and the shares are held by CBL as collateral only." *Id.*

Manasian wrote the letter because his client, Worldwide Wireless, believed that restricted stock that it had provided to Douglas Brandon to hold "in trust" pursuant to a CBL credit facility agreement was being sold by or through Deutsche Bank. *See* Eiseman Decl. Exh. 51, at 13–18 (Manasian Dep.). Manasian testified that he initially tried to contact Brandon by telephone and then by letter to raise the issue with him, but he received no response. *Id.* at 18. Manasian then decided to send the letter to Deutsche Bank in order to put Deutsche Bank on notice that CBL was not the owner of the shares, and thus that the shares should not be sold or margined. *Id.* at 37.

Manasian testified that he asked an associate of his "to call Deutsche Bank, explain the situation to them, tell them what we're trying to communicate, [and] find out who it was that we should communicate to." *Id.* at 19. His associate "said that he had been told that Mr. Caffrey was the person, and had Mr. Caffrey's contact information for me to use." *Id.* The letter was faxed to the number they were given, and Manasian's assistant called what she believed to be "Mr. Caffrey's direct line," and received confirmation that Caffrey had received it. *See* Eiseman Decl. Exh. 48, at 11–12. Neither Manasian, his assistant, nor anyone else received a response to the WWW letter. *See* Eiseman Decl. Exh. 51, at 25; Exh. 48 at 14.

Deutsche Bank maintains that Caffrey was on vacation at the time, and that neither Caffrey nor anyone else at the bank ever received the WWW letter. Deutsche Bank also asserts that Caffrey had nothing to do with the management of CBL's accounts at Deutsche Bank, and had no responsibility for extending margin loans to CBL. He worked in a different department at Deutsche Bank from Houben, performed a different function, and was located in an office on another continent. Caffrey worked on a trading desk buying and selling securities in the public markets. He had never heard of CBL and had no dealings with Houben. *See* Windels Decl. Exh. 26 ¶ 1; Exh. 27 (Caffrey Dep.) at 117–18, 151. Further, the fax was sent to a now-unused phone number unrecognized by Caffrey. *See* Windels Decl. Exh. 27 at 2–3, 27, 107.

Caffrey testified that no one regularly checked the fax machine that the used for incoming faxes and that he did not have confidence that faxes were sent to his machine would be delivered to him. Caffrey Dep. at 28. Caffrey also testified that if a letter addressed to someone else at Deutsche Bank was inadvertently sent to him, he would not know what to do, and that he would likely do nothing with the letter. *Id.* at 103–04. Caffrey also stated that if a letter addressed to him did not fall within the scope of his work at Deutsche Bank, he would not have made any effort to identify and to forward the communication to the appropriate person at Deutsche Bank. *Id.* at 114–17.

**The WWW Press Releases and Lawsuits**

On August 10, 1999—one day before the WWW letter was faxed to Caffrey—WWW issued a press release alleging that WWW was investigating CBL's short selling of WWW shares through CBL's brokerage house. *See* Eiseman Decl. Exh. 32. The press release referred to, and denied the

truth of, a statement by CBL that the short selling was the result of an "option strategy with hedging" arising out of an agreement between CBL and a major WWW shareholder. The press release stated that neither the "Credit Facility Agreement" ("CFA") entered into between CBL and the shareholder, nor the related "Trust Agreement" authorized the trading activities. *Id.*

Approximately two weeks later, on August 26, 1999, one of the Worldwide Wireless companies filed a lawsuit for permanent injunctive relief, defamation and fraud against CBL, Blech and others in the United States District Court for the Northern District of California. A press release issued by the company that same day described the lawsuit, as well as a separate lawsuit filed at the same time by its parent company against CBL. *See* Eiseman Decl. Exh. 33. The press release describes the allegations of the lawsuits (collectively, the "WWW lawsuits") in considerable detail. *Id.* The press release referred to the fact that, under the CFA, restricted WWW shares were pledged by WWW as collateral for a loan and that, according to the Trust Agreement between CBL and WWW, the trustee, Douglas Brandon, was required to inform any broker-dealer at which the pledged shares were deposited that the shares were restricted, were owned by Worldwide Wireless and not CBL, and were collateral for a loan. The press release stated that WWW's Complaint alleged that Brandon failed to inform the broker-dealers as required and as the company requested him to do on several occasions. WWW also claimed that the defendants in the lawsuit represented to it that the WWW shares would not be used improperly and stated that defendants would not engage in short selling in any way that would affect Worldwide Wireless's share price.

The August 26 press release indicated that WWW was seeking to rescind the CFA and to require the return of the pledged shares to WWW, "their rightful owner." *Id.* WWW sought a permanent injunction to prevent the defendants from using the pledged shares other than as collateral and to require Brandon to inform any broker-dealer with whom the shares had been deposited of the Rule 144 restrictions governing them and that they were not owned by CBL.

In his testimony before the Court, Blech recounted that Houben had faxed a copy of the first press release on or about August 10, 1999, and that Blech then had a phone conversation with Houben. Also present and on speaker phone with Houben were Basil Shoukry and Gary Tiernan, who were employees in the CBL trading department in Geneva. Blech testified that Houben asked him "what I knew about it, about the circumstances and what, if anything, are we going to do about it." (6/23/03 Tr. at 139). Blech also testified that he talked by telephone with Houben about the second press release on or about August 26, 1999, with Shoukry present in the room with him. *Id.* at 141. According to Blech, Houben asked about the short selling, and Blech told him that he believed that WWW "did indeed understand that we would be engaging in some kind of selling, short selling activity to obtain the loan funds." When Houben asked about the shares being restricted, Blech also told Houben that "the restriction issue is between CBL and the counterparty." *Id.* at 143. There is no evidence that Houben took any further action with respect to the allegations contained in the two press releases.

### The CBL Credit Facility Agreements

CBL perpetrated its Ponzi scheme through the use of an arrangement that it called an "insured credit facility." The

Court has described the arrangement as follows:

Credit Bancorp solicited customers to deposit securities, cash and other assets to be held in trust with the promise of a return in the form of a "custodial dividend" based upon a percentage of the market value of the deposits, as well as to invest cash and mutual funds to be managed by Credit Bancorp and invested at above-market rates .... Credit Bancorp promised customers who deposited securities that those securities would not be sold, pledged, hypothecated or otherwise encumbered. Credit Bancorp, contrary to its assurances, misappropriated the assets entrusted to it by the customers.

*Credit Bancorp III,* 2000 WL 1752979, at *8.

The CFA was essential to CBL's scheme. The CFA and associated marketing described the "credit facility" as an arrangement by which enrollees provide assets to CBL as collateral for a credit line; even if the enrollee does not draw on the credit line, though, CBL will pay to the enrollee a "custodial fee" simply for allowing CBL to hold the assets. *See* Eiseman Decl. Exh. 35. The fee, according to the CFA, is generated from an "off-balance sheet credit line [given to CBL] by Swiss banking counter-parties." *Id.* at DB 2047. The CFA purports to explain that because "Credit Bancorp has given discretion over its trading line to its Swiss counter-parties to execute only risk-less arbitrage trades (via simultaneous executions) [,] ... Credit Bancorp is able to receive an unsecured credit line." *Id.* The CFA states that "[t]here are two reasons why the arbitrage transactions that generate profits to pay the owner his or her custodial dividend are risk-less:"

(1) The arbitrage trade itself is a "simultaneous execution," wherein both the buy side and the sell side of the transaction are executed at the same time. The Swiss bank has written instructions directing it to only execute an arbitrage trade where there is a built-in profit. (2) If the Swiss bank were to improperly execute a trade where there is a loss, Credit Bancorp has at least three days from the date it is notified of the loss to void the trade.

*Id.* at DB 2048.

On August 16, 1999, Deutsche Bank's legal department received a copy of CBL's CFA. *See* Eiseman Decl. Exh. 36. The CFA had been provided to a Deutsche Bank representative in Georgia during the summer of 1999 by a client who wanted to know if Deutsche Bank could offer a similar arrangement. *See* Eiseman Decl. ¶ 19. The CFA was sent on to a Deutsche Bank employee in the stock lending group. She forwarded it to the head of that group, who in turn forwarded it to Deutsche Bank in-house attorney Bruce Ismael on August 16, 1999. *See* Eiseman Decl. Exh. 45 at 38 (James Conti Dep.); Eiseman Decl. Exh. 37.

Ismael initially showed the CFA to his supervisor in the legal department, Marianna Maffucci, as well as to two other inhouse attorneys, including Marcelo Riffaud. *See* Eiseman Decl. Exh. 36 & 38. Ismael also furnished a copy to Ed Johnsen, a lawyer then in the compliance department of Deutsche Bank's New York office. *See* Eiseman Decl. Exh. 38. Johnsen, then head of equities compliance at Deutsche Bank, and a member or former member of the NASD Market Regulation Committee, reviewed the CFA and retained it. *See* Eiseman Decl. Exh. 53 at 11; Exh. 58.

In October 1999, the Deutsche Bank Legal Department independently received a second copy of the CFA. *See* Eiseman Decl. Exh. 35. This second copy was for-

warded by Deutsche Bank Managing Director and head of the pension strategies group, Maarten Nederlof. *See* Eiseman Decl. Exh. 38. Nederlof testified that he was provided the CFA by a potential client, who asked for Nederlof's opinion of the CFA. *See* Eiseman Decl. Exh. 52 at 15 (Nederlof Dep.). The statements in the CFA apparently had evoked skepticism in the potential client, who wrote in the margins of the CFA: "[i]f everything is true, then the banks would be foolish in giving you credit based on assets you don't own." *See* Eiseman Decl. Exh. 35, at DB 2047. That same person also wrote in the margins: "if these banks are capable of generating cash through 'riskless' arbitrage, why not do it themselves." *Id.*

Nederlof "skimmed the document and then sent a copy to [Deutsche Bank's] in-house counsel in order to seek his legal advice on what it contained." *See* Eiseman Decl. Exh. 52 at 18. The lawyer to whom Nederlof forwarded the CFA was Marcelo Riffaud, who had also been given the first CFA sent to the Deutsche Bank legal department. *Id.* Following a conversation between Riffaud and Nederlof, Nederlof contacted his potential client and expressed reservations concerning the CFA. Nederlof told the potential client that he "had looked at it, that it had raised a number of questions, and I would have reservations without a lot more analysis." *Id.* at 22.

Scott Cook, the compliance officer for Charles Schwab & Co., another brokerage firm that maintained an account for CBL, testified that the terms of the CFA itself aroused suspicion of fraud. Cook, a lawyer formerly employed in the Enforcement Division of the SEC, reviewed the same materials as those furnished to Deutsche Bank and concluded that "certain aspects of [the CFA] echoed fraud schemes that [he] had been aware of at the [SEC]." *See*

Eiseman Decl. Exh. 45 at 107 (Cook Dep.). Cook was sufficiently suspicious of the CFA that he forwarded it to the San Francisco branch of the SEC. *Id.* at 110.

### The Tendering of the Praegitzer Shares

At the end of November 1999, after the SEC initiated its action against CBL, the negative cash balance in the CBL Account was approximately $15.8 million. *See* Eiseman Decl. Exh. 43. As of February 28, 2003, there was a negative cash balance of $14,414,687. The negative cash balance in the Tasin Account at the end of November 1999 was approximately $6 million. *See id.* As of February 28, 2003, the negative balance was $2,965,976.

Deutsche Bank explained to the Receiver that "[t]he principal reason for the decreases was the tendering of shares in Praegitzer Industries in December 1999." *Id.* Deutsche Bank tendered 629,000 shares of Praegitzer stock from the Tasin Account for $3,459,000 on December 6, 1999, and 500,000 shares of Praegitzer stock from the CBL Account for $2.75 million on December 8, 1999. *See id.* In December 1999, the Receiver, who was then Fiscal Agent for CBL, was informed of Deutsche Bank's intention to tender the Praegitzer shares, and did not object to the tender. The Receiver did not learn until after Deutsche Bank had tendered the shares that Deutsche Bank had applied that proceeds of the tender offer to reduce CBL's margin debts. The Second Circuit ruled that the tender of the Praegitzer shares violated the SEC's Freeze Order. *See CBL I*, 290 F.3d at 85 n. 6 ("In defiance of a Freeze Order imposed by the SEC, the depository institutions seized the proceeds of the sale of Praegitzer's stocks, and applied them to pay down CBL's margin loans.").

### CONCLUSIONS

The margin agreements entered into between CBL and Deutsche Bank purport to

give Deutsche Bank a lien on each and every asset in the CBL and Tasin Accounts as security for CBL's margin debt to Deutsche Bank. SECO contends that in the context of an SEC enforcement action in which a federal equity receivership has been created, equitable principles apply, and the Receiver, or the Court on behalf of the receiver, may set aside "at law" claims such as Deutsche Bank if necessary. Deutsche Bank and the Receiver, on the other hand, argue that the validity and extent of Deutsche Bank's margin lien are governed by Revised Article 8 of the U.C.C. *See Credit Bancorp III*, 2000 WL 1752979, at *33 ("There appears to be no dispute that the broker-dealers' interest are governed by the terms of the margin agreement between Credit Bancorp and the given institution and by Article 8 of the U.C.C.").[4]

## The Court's Equitable Powers Are Insufficient to Set Aside Otherwise Valid "At Law" Claims

■ SECO cites no caselaw for the proposition that "the Receiver's equitable powers may trump claims for specific 'at law' relief made by the victims of a fraudulent scheme." SECO Brief, at 3. Instead, SECO makes an equitable argument that because Deutsche Bank

does not have clean hands ... allowing Deutsche Bank to elevate its claim above that of SECO and other defrauded victims based on its asserted "at law" lien is no more proper than allowing SECO to use its contract with CBL to obtain the return of Vintage stock,

something this Court and the Second Circuit have not allowed SECO to do. *Id.* at 3–4.

SECO refers to an earlier decision of this Court which rejected SECO's motion for a recovery of its securities. SECO there contended that because its securities were traceable, it was entitled to have them returned after CBL's fraud was discovered. SECO argued that its claims were "governed by contract law, the U.C.C. and the law of bailment." *Credit Bancorp III*, 2000 WL 1752979, at *13. This Court found for the Receiver, who argued that "these claims are governed by the law of federal equity receiverships and, more specifically, the law governing the distribution of assets to defrauded investors in such receiverships." *Id.* The Court cited numerous cases involving a receivership in which tracing was disallowed in favor a *pro rata* distribution. The law of other Circuits was also cited for the proposition that "equitable principles may supersede rights an investor would have under other law to recover its assets through tracing." *Id.* at *15 (citing *U.S. v. Vanguard Investment Co., Inc.*, 6 F.3d 222, 226 (4th Cir.1993) ("[E]ven if entitlement [to trace assets] under state law could be established, that wouldn't end the matter in this federal receivership."); *S.E.C. v. Elliott*, 953 F.2d 1556 (11th Cir.1992) (affirming pro rata distribution plan because of inequity of affording some investors priority, through tracing, based on theories of equitable relief such as fraud, misrepresentation and theft)).

The Court's holding on this point was upheld by the Second Circuit in *CBL I.*

---

**4.** No party contests the proposition that the validity and extent of Deutsche Bank's margin lien may be decided in the context of a summary proceeding. *See Credit Bancorp III*, 2000 WL 1752979, at *33 (noting that summary proceedings "have been held to satisfy the requirements of procedural due process in adjudicating claims of both parties and non-parties to assets held in a federal equity receivership." (citing *Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1113 (9th Cir.2000); *S.E.C. v. Elliott*, 953 F.2d 1560, 1567 (11th Cir.1992))).

The Second Circuit first noted that "[u]nder [New York] state law, assets acquired by fraud are subject to constructive trust for the benefit of the defrauded party." *Id.* at 88 (citing cases). But the Court of Appeals went on to hold that "whatever beneficial interest SECO might have in the transferred shares, arising from a constructive trust, does not defeat the equitable authority of the District Court to treat all fraud victims alike (in proportion to their investments) and order a *pro rata* distribution." *Id.*

The present dispute can be distinguished from the decisions to which SECO refers because neither the Court nor the Second Circuit held that valid "at-law" claims could be rejected in favor of the exercise of equitable powers. SECO's arguments were recognized as equitable claims. *See Credit Bancorp III,* 2000 WL 1752979, at *18 ("the SECO Intervenor's claims ... [are] properly construed as [claims] for restitution," an equitable claim).[5] The claims asserted by Deutsche Bank, on the other hand, are "at-law" claims. Its claim to the Vintage shares, for example, has been recognized as a legal and not merely an equitable claim. *See CBL I,* 290 F.3d at 87 ("the documents knowingly executed by SECO to transfer its Vintage shares in fact and in law ac-complished an outright transfer of share ownership from SECO to CBL.").

Deutsche Bank cites case law for the proposition that a receiver takes property subject to valid legal encumbrances. *See Marshall v. People of New York,* 254 U.S. 380, 386, 41 S.Ct. 143, 65 L.Ed. 315 (1920) ("[A] receiver appointed by a federal court takes property subject to all liens, priorities, privileges existing or accruing under the law of the state."); *Lankenau v. Coggeshall & Hicks,* 350 F.2d 61, 66–67 (2d Cir.1965) ("Assuming that C & H's attachment efforts were sufficiently perfected under the circumstances under state law to create some kind of lien or priority rights in their favor ... appointment of a federal court receiver does not destroy those rights. The receiver takes custody of the property subject to any rights previously acquired by the attachment.").[6]

Despite the age of the cases, the proposition for which they stand is still valid. The Court has discovered no instance in which a court applying the law of federal equity receivership has rejected a valid "at-law" claim in favor of an equitable claim. Accordingly, the U.C.C. and the language of the agreements governs. Deutsche Bank's argument that SECO's unclean hands prevent it from prevailing under equitable principles will therefore not be considered.

---

**5.** Even if the U.C.C. applied to SECO's previous claims, as it argued then, its claims would be defeated not by equitable powers, but by the language of the U.C.C. itself, which dictated that in the context of that dispute, "insolvency law" applied, meaning in that case, "the law governing the assets to defrauded investors in a federal receivership" is applicable. *Id.* at *23; *see also CBL I,* 290 F.3d at 90 ("receiverships are 'insolvency proceedings,' and ... the law of federal equity receiverships applies."). In other words, even as a legal claim, SECO's previous claims were appropriately decided by equitable principles. In the present dispute, the U.C.C. does not direct that insolvency law applies.

**6.** In oral argument, SECO contended that *Lankenau* supports its position, citing the sentence which follows the one just quoted: "It is possible that C & H's attachment rights may ultimately be subordinated to a better claim, as, for example, where the attached assets are themselves traced assets." *Id.* at 67. But that sentence merely indicates that the assumption on which the previous sentence rested is not necessarily correct; it does not challenge the principle that a valid legal claim takes priority.

## Notice of Adverse Claims Under the U.C.C.

All parties agree that Part 5 of Revised Article 8 is the applicable section of the U.C.C. Part 5 sets out the rules governing the "indirect" securities holding system. *See* Official Comment 4 to U.C.C. § 8–501 ("Part 5 of Article 8 sets out a carefully designed system of rules for the indirect holding system").[7] "Indirect holding means that the interest is held through an intermediary rather than by holding a certificate or by registration with the issuer of the securities." *Credit Bancorp III,* 2000 WL 1752979, at *21. The interests of a person who holds securities through brokers or custodians are accordingly governed by Part 5. These interests are called "security entitlements." Official Comment 4 to U.C.C. § 8–501 ("Persons who hold securities through brokers or custodians have security entitlements that are governed by Part 5").

As defined in Revised Article 8, a "security entitlement" means "the rights and property interest of an entitlement holder with respect to a financial asset specified in Part 5." U.C.C. § 8–102(a)(17). An "entitlement holder" is defined as "a person identified in the records of a securities intermediary as the person having a security entitlement against the securities intermediary." U.C.C. § 8–102(a)(7). A "securities intermediary" means "a clearing corporation" or "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity." U.C.C. § 8–102(a)(14). A "securities account" is defined as "an account as to which a financial asset is or may be created in accordance with an agreement under which the person maintaining the account undertakes to treat the person for whom the account is maintained as entitled to exercise the rights that comprise the financial asset." U.C.C. § 8–501.

In the context of this proceeding, Deutsche Bank is a "securities intermediary"; the CBL and Tasin Accounts are "securities accounts"; and CBL is an "entitlement holder," holding a "securities entitlement" to each of the assets credited to the CBL and Tasin Accounts. *See* U.C.C. § 8–501(b).

Section 510 of Revised Article 8 provides protection against adverse claims to parties, such as Deutsche Bank, that have acquired a lien on security entitlements, but only to the extent that the secured party is able to show that it meets each of three criteria. Section 510 provides, in part:

(a) An action based on an adverse claim to a financial asset or security entitlement, whether framed in conversion, replevin, constructive trust, equitable lien, or other theory, may not be asserted against a person who purchases a security entitlement, or an interest therein, from an entitlement holder if the purchaser gives value, does not have notice of the adverse claim, and obtains control.

Because the motion by the Receiver is "an action based on an adverse claim to a financial asset or security entitlement," this Section applies here. The Receiver "represents the interests of all ... of Credit Bancorp's customers." *Credit Bancorp I,* 194 F.R.D. at 461. The customers of CBL, as beneficial owners, have a property interest in the assets credited to the

---

**7.** New York's U.C.C. is applicable to the CBL Account, and Maryland's U.C.C. is applicable to the Tasin Account. But because every relevant provision of both codes are identical, sections of the U.C.C. will be cited without reference to either New York or Maryland law.

CBL and Tasin Accounts and the security entitlements relating to them. CBL did not have the right to pledge those assets and security entitlements as collateral for CBL's own margin debt. On this basis, the Receiver seeks to retrieve, for the benefit of the customers, all assets in the CBL and Tasin Accounts that are not subject to valid liens.

There is no dispute that Deutsche Bank "gave value" to CBL in exchange for the security interest. Under the U.C.C., giving "value" expressly includes acquiring rights "in return for a binding commitment for the extension of immediately available credit whether or not drawn upon." § 1–201(44)(a). Under the margin agreements, Deutsche Bank committed to extend credit to CBL and, in return, obtained security interests in CBL's accounts. Nor is there any dispute that Deutsche Bank "obtained control" of the security entitlements relating to the assets in the CBL and Tasin Accounts. Section 8–106(e) provides that "[i]f an interest in a security entitlement is granted by the entitlement holder to the entitlement holder's own securities intermediary, the securities intermediary has control." Under the margin agreements, CBL granted Deutsche Bank a security interest in all the securities in its accounts. *See* Windels Decl. Exh. 2 ¶ 10; Windels Decl. Exh. 15 ¶ 10.

All parties acknowledge that the issue is whether Deutsche Bank had notice of adverse claims in the CBL accounts. *See also Credit Bancorp III*, 2000 WL 1752979, at \*33 ("The critical issue is whether the institution had notice of adverse claims to the securities held in the Credit Bancorp accounts"). The validity and extent of Deutsche Bank's claimed security interest hinges upon whether it had notice of adverse claims by CBL's customers to the securities pledged as collateral by CBL.

**Notice of Adverse Claim under U.C.C. § 8–105(a)**

The U.C.C. defines an adverse claim as a claim that a claimant has a property interest in a financial asset and that it is a violation of the rights of the claimant for another person to hold, transfer or deal with the financial asset.

U.C.C. § 8–102(a)(1). The Commentary to U.C.C. § 8–105 more specifically notes that an

[a]dverse claim does not include all circumstances in which a third party has a property interest in securities, but only those situations where a security is transferred in violation of the claimant's property interest. Therefore, awareness that someone other than the transferor has a property interest is not notice of an adverse claim. The transferee must be aware that the transfer violates the other party's property interest.

Official Comment 2 to U.C.C. § 8–105.

Section 8–105(a) of the U.C.C. provides that a party has "notice of an adverse claim" if it can be proved that:

(1) the person knows of the adverse claim;

(2) the person is aware of facts sufficient to indicate that there is a significant probability that the adverse claim exists and deliberately avoids information that would establish the existence of the adverse claim; or

(3) the person has a duty, imposed by statute or regulation, to investigate whether an adverse claim exists, and the investigation so required would establish the existence of the adverse claim.

The Official Commentary to § 8–105 explains that, for purposes of the first subsection, "[k]nowledge is defined . . . as actual knowledge." Official Comment 3 of § 8–105. SECO argues that Deutsche Bank did have actual knowledge under

§ 8–105(1) in addition to awareness and deliberate avoidance under § 8–105(2). The Receiver argues only that Deutsche Bank had notice under § 8–105(2). Neither SECO nor the Receiver argue that Deutsche Bank had a statutory or regulatory to duty to investigate possible adverse claims under § 8–105(3).

According to the U.C.C. Official Commentary, § 8–105(a)(2) "is intended to codify the 'willful blindness' test that has been applied in such cases as *May v. Chapman*, 16 M. & W. 355, 153 Eng. Rep. 1225 (18470)[and] *Goodman v. Simonds*, 61 U.S. 343, 20 How. 343, 15 L.Ed. 934 (1857)." Official Comment 4 to U.C.C. § 8–105. Caselaw decided under former Article 8, which was a "bad faith" standard, is relevant because under that Article, "the willful blindness test was still the law." 7A *Hawkland Uniform Commercial Code Series*, § [Rev] 8–105:02 (2001). That caselaw lends support to the Commentary's interpretation of § 8–105(2). *See, e.g., Carr v. Marietta Corp.*, 211 F.3d 724, 732 (2d Cir.2000) (collecting cases for the proposition that "under Article 8 of the UCC, which governs the transfers of securities ... a party does not act in good faith if she acts with knowledge and disregard of suspicious circumstances").

■ The first prong of the willful blindness test "turns on whether the person is aware [of] facts sufficient to indicate that there is a significant probability that an adverse claim exists." Official Comment 4 to U.C.C. § 8–105. Whether the person is aware "necessarily turns on the actor's state of mind." *Id.* That means, however, that the individual need only have actual awareness of the *facts* giving rise to suspicion. Actual suspicion is not necessary. The Comment explains that whether the facts known "make the person aware of a 'significant probability' that an adverse claims exists · turns on facts about the world and the conclusions that *would be* drawn from those facts, taking account of the experience and position of the person in question." *Id.* Such awareness may be found if the transferee of a security is "familiar with enough facts and circumstances to at least suspect that the transaction ... was wrongful." *Catizone v. Memry Corp.*, 897 F.Supp. 732, 738 (S.D.N.Y.1995). Suspicious circumstances have been found where a lender who received as security a stock certificate in the name of a party other than the borrower, and which contained a legend on the certificate indicating the stock was restricted, and could tell that the stock was "unlikely" to be exempted from restriction. *See id.* at 737–38; *see also Drexel Burnham Lambert Group, Inc. v. A.W. Galadari*, No. 84 Civ. 2602, 1987 WL 6164, at *25 (S.D.N.Y. Jan.29, 1987) (finding notice of an adverse claim where there was an "obvious discrepancy between the name signed on the Stock Powers and the name of the registered owner printed on the share certificates").

■ The second prong of the willful blindness test "turns on whether the person 'deliberately avoids information' that would establish the existence of an adverse claim." Official Comment 4 to U.C.C. § 8–105. The question, according to the Commentary, "is whether the person deliberately failed to seek further information because of concern that suspicions would be confirmed." *Id.* In the absence of suspicious circumstances, the willful blindness test does not impose a duty of inquiry or a due diligence requirement. *See e.g., In re Legel Braswell Gov't Sec. Corp.*, 648 F.2d 321, 327–28 (5th Cir.1981) (UCC does not impose duty of inquiry where certificates are pledged without restriction); *Satterfield v. Haymond*, No. CIV.C–84–0646W, 1985 WL 17576, at *7 (D.Utah Oct.31, 1985) ("a purchaser does not have a duty

to inquire into the rightfulness of the transfer even if he has notice that the security is held for a third party.").

■ To an extent, the U.C.C. also rejects the notion of the "collective knowledge" of an organization which might impute knowledge possessed by certain employees throughout a corporation. The U.C.C. Commentary states:

[A]n organization that purchases a security is not willfully blind to an adverse claim unless the officers or agents who conducted that purchase transaction are willfully blind to the adverse claim . . . . [Those] individuals conducting a transaction must know of facts indicating a substantial probability that the adverse claim exists and deliberately fail to seek further information that might confirm or refute the indication. For this purpose, information known to individuals within an organization who are not conducting or aware of a transaction, but not forwarded to the individuals conducting the transaction is not pertinent in determining whether the individuals conducting the transaction had knowledge of a substantial probability of the adverse claim.

*Id.; see also Gutekunst v. Cont'l Ins. Co.,* 486 F.2d 194, 196 (2d Cir.1973) ("notice received by one branch of a bank does not constitute constructive notice to any other branch of the same bank"). That does mean, however, that the relevant individuals can be sheltered from any suspicious information in an effort by the organization to forestall notice. The Commentary also provides that:

An organization may also "deliberately avoid information" if it acts to preclude or inhibit transmission of information to those individuals responsible for the conduct of purchase transactions.

*Id.* In accordance with the emphasis in the Commentary on willful blindness, the ac-

tions taken by an organization to preclude the transmission of information must be found to be intended to keep individuals from receiving information which would put them on notice. It is not enough that an organization merely has sloppy or inadequate procedures in place.

■ In summary, to determine whether Deutsche Bank had notice of an adverse claim, the following questions must be asked:

(1) Did the relevant individuals at Deutsche Bank have actual knowledge of an adverse claim?

(2) If not, would the circumstances presented be sufficient to put Deutsche Bank on notice of an adverse claim, or at least to constitute suspicious circumstances warranting further investigation?

(3) If so, were the relevant individuals aware of suspicious circumstances which might indicate the existence of an adverse claim (whether or not they report being suspicious), and did they then deliberately fail to seek further information that might confirm or refute the indication?

(4) If not, did Deutsche Bank, as an organization, deliberately preclude or inhibit the transmission of information to the relevant individuals?

The Receiver and SECO have identified five separate events which, considered either individually or together, they argue, gave Deutsche Bank notice of the existence of an adverse claim: (1) the confiscation of the DCH shares; (2) the Blech and Praegitzer Letters regarding the Praegitzer shares; (3) the WWW letter; (4) WWW press releases and lawsuits; and (5) the receipt of the CBL CFAs by Deutsche Bank's legal department. It is the position of SECO that as a result of the receipt of the DCH-related correspondence, that

Deutsche Bank was on notice of an adverse claim as of December 1, 1998. The Receiver argues that against the "back-drop" of the DCH and Praegitzer events, the receipt of the WWW Letter on August 11, 1999 raised a substantial probability that "the other shares in the Account were ... owned by third parties and had also been wrongfully pledged as collateral to Deutsche Bank." Receiver Reply Mem. at 4.

**Houben and Hoddinott Are the Relevant Individuals**

For purposes of determining whether Deutsche Bank had notice of an adverse claim against the securities in the CBL and Tasin Accounts, the relevant parties are "the officers or agents who conducted [the] purchase transaction." Official Comment 4 to U.C.C. § 8–105. The agents who conducted the relevant purchase transactions here are Reindert Houben and Thomas Hoddinott. Houben was the BTAB broker responsible for opening the CBL Account and continued to be the account representative for the CBL Account up until the SEC filed suit against CBL. Houben testified that he was the "most responsible for the account," even though the responsibility of two others (Gail Rosen and Keith Cummins) was not negligible. (6/20/03 Tr. at 58, 60). Further, under Deutsche Bank's procedures at the time, initial responsibility for margin lending lay with the broker assigned to the account—Houben.

Hoddinott, who at all relevant times was the Vice President of Credit for DBAB, worked in the department which oversaw CBL's margin borrowing and the securities hypothecated by CBL as collateral for such borrowing. Of the credit line increases that Deutsche Bank approved for CBL, most were approved by Hoddinott. (Deutsche Bank Mem. at 11).

While Houben testified that there were others at Deutsche Bank who shared responsibility for the CBL Account, including "Greg Barnhill, Derrick Collins, Keith Cummins [and] Gail Rosen," (6/20/03 Tr. at 58), the Receiver and SECO have focused on the notice given to Houben and Hoddinott.

**1. Confiscation of the DCH Shares**

SECO argues that based on the correspondence relating to the confiscation of the DCH shares, that Deutsche Bank, through Houben, had actual knowledge of third party ownership of shares in the CBL Account. While the Receiver does not argue that the events related to the DCH shares put Deutsche Bank on notice, he does claim that they establish that by December 23, 1998, Deutsche Bank was aware that "the DCH shares had not belonged to CBL at the time they were deposited into the Account." Receiver Reply Mem. at 4. There is no need to determine whether Houben's awareness amounted to actual knowledge because even full knowledge of the evidence presented would not be sufficient to create notice of an adverse claim, or even of suspicious circumstances warranting further investigation.

The U.C.C. Commentary is clear that notice of third party ownership is not sufficient to constitute notice of an adverse claim; there must also be notice that "a security is transferred in violation of the claimant's property interest." Official Comment 2 to U.C.C. § 8–105. The latter condition is absent here. Deutsche Bank convincingly argues that the circumstances surrounding the confiscation of the DCH shares "suggest that some sort of transaction involving the DCH shares had occurred between CBL and Oxford and that there was either confusion or possibly a dispute relating to payment for the

shares." Deutsche Bank Reply Mem. at 5. When CBL initially deposited the DCH shares, they were marked "Restricted," which indicated that there were ownership restrictions, and that they could not be sold easily. Accordingly, Deutsche Bank placed them in a Type 1, or cash account, and they were not used as collateral for margin loans.

The request to re-register the DCH shares in the name of Oxford International came from CBL. CBL was therefore not trying to conceal the fact that Oxford International may have had third party ownership. Deutsche Bank inquired as to whether CBL's request was authorized. Deutsche Bank then learned, from DCH's transfer agent and later from CBL, that the shares had not been paid for and were to be cancelled. Deutsche Bank thus ensured that DCH was aware of and approved CBL's plans for the shares. As Deutsche Bank has argued, "CBL, DCH and the transfer agent ultimately all agreed about how Deutsche Bank should handle the transaction, and Deutsche Bank complied with the instructions given to it." Deutsche Bank Reply Mem. at 5. The fact that Houben may have had actual knowledge of third party ownership of the DCH shares is therefore not sufficient to create notice of an adverse claim to those shares. Neither SECO nor the Receiver has provided evidence that Deutsche Bank was aware that CBL was acting in violation of DCH's property interest.

Both SECO and the Receiver argue that the fact that CBL was trading in restricted securities should have raised suspicions because Houben was under the impression that all assets in the CBL accounts came from the Blech family. Houben has testified that he believed that all assets in the CBL Account "were owned by Mr. Richard Blech and/or family." Eiseman Decl. Exh. 50 at 143. However, that it is not inconsistent with either having restricted securities in the account, or with processing restricted securities in order to remove the restriction. Houben testified before this Court that the removal and processing of restricted stock is one of the "services and products that ... Deutsche Bank offers to its institutional clients or high net worth clientele." (6/20/03 Tr. at 18). Houben further testified similarly with respect to shares registered to someone other than Blech or CBL:

> Q: Were there any securities deposited in the accounts with the name of another party printed on them?
>
> A: There may have been.
>
> Q: What, if anything, would that indicate about the ownership of the securities at the time they were deposited into the account?
>
> A: If that were the case, it would not necessarily imply that those securities would not be Credit Bancorp securities, would not be owned by Credit Bancorp.
>
> Q: Under what circumstances could those securities be the property of Credit Bancorp?
>
> A: That could become the case when those securities are transferred to Credit Bancorp upon a purchase or a gift or other transactions that obviously are outside the sphere of influence of Deutsche Bank's broker-dealer.

*Id.* at 19–20. Houben also testified that he did ask Blech or other representatives of CBL "whether they manage assets that belong to third parties," and was told that they did not. *Id.* at 67–68. But having restricted securities or securities with another party's name on them is not necessarily an indication that CBL was managing assets of third parties. The events surrounding the confiscation of the DCH shares therefore do not give rise either to notice or suspicion of the existence of an adverse claim simply because the shares

were restricted or because CBL requested the re-registration and return of the shares.

## 2. The Blech and Praegitzer Letters

The situation is somewhat different, however, with respect to the Praegitzer shares. The Blech Letter from November 30, 1998 together with the Praegitzer letter from December 1, 1998 would have been sufficient to raise suspicions that an adverse claim to the Praegitzer shares existed. The Praegitzer Letter, in particular, specifically states that "the Shares are held by Mr. Praegitzer," Eiseman Decl. Exh. 17, and there is no indication, as there was with the DCH shares, that ownership is about to change or that CBL is requesting that the shares be returned. To the contrary, CBL was just delivering the shares owned by Mr. Praegitzer to Deutsche Bank. Houben testified that a "red flag" might be raised "upon the receipt of any small or large amount of stock into a Deutsche Bank Alex. Brown account would be . . . is such were being done in the name of someone other than the client or customer . . . of Deutsche Bank Alex. Brown." Eiseman Decl. Exh. 51 at 368.

No evidence, however, has been provided by either the Receiver or SECO that either Houben or Hoddinott ever saw the Praegitzer Letter. Deutsche Bank maintains that the letter was not in their files. Unlike the Blech Letter, Houben was not copied on the Praegitzer Letter. The addressee, Epperly, does not recall receiving the letter, nor do any of Epperly's supervisors. In the absence of evidence that the parties conducting the CBL transactions either saw or knew of the Praegitzer Letter, notice of an adverse claim cannot be charged to those individuals.

There is also no evidence that Deutsche Bank acted deliberately to preclude or inhibit the transmission of the Praegitzer Letter to Houben. SECO has charged only that "Deutsche Bank had no policy to deal with [the issue raised by the Praegitzer Letter] absent 'front office' directions on the face of the letter." SECO Mem. at 15. But the absence of a general policy does not establish the deliberate withholding of such letters—and the Praegitzer Letter in particular—from the parties responsible for conducting the account. SECO does not even maintain its charge of inadequate procedures because it also argues that despite the alleged absence of a policy regarding such correspondence, "Houben more than likely did receive both" the Blech Letter and the Praegitzer letter. *Id.* at 17. SECO provides no evidence for this speculation.

## 3. The WWW Letter

Receipt of the WWW Letter would have been sufficient to put the relevant parties at Deutsche Bank on notice of an adverse claim. Given that Houben maintains that he believed that Blech was trading in family-owned assets for the entire time that he was the account representative for the CBL Account, the notification in the letter that the shares of WWW stock deposited into the CBL Account "were pledged as collateral for a loan to be made by CBL to Worldwide Wireless, Inc.," *see* Eiseman Decl. Exh. 31 (the WWW Letter), would at the least constitute suspicious circumstances which would require further investigation.

However, as with the Praegitzer Letter, there is no evidence that either Houben or Hoddinott ever saw the WWW Letter. Despite the efforts by Manasian and his associate to send the letter to the correct recipient, the Letter was sent to a Deutsche Bank employee who had never heard of CBL and who had no contact with Houben. *See* Windels Decl. Exh. 27 at 117–18. Further, Caffrey has no record or

recollection of the Letter. In any case, there is no evidence that the WWW Letter was forwarded on to anyone dealing with the CBL Account.

The Receiver has alleged that the WWW Letter did not reach Houben because of "Deutsche Bank's apparent lack of internal systems and procedures for forwarding correspondence to appropriate personnel." Receiver Mem. at 30. While the Receiver has put forward some evidence that the WWW Letter "should have been transmitted to [Deutsche Bank's] compliance and in-house legal departments," *id.* at 31, the Receiver has not shown that Deutsche Bank deliberately acted to preclude the letter from reaching an employee who conducted CBL transactions. The Receiver attempts to create an inference of deliberate action by arguing that "it was the absence of strict policies and procedures at Deutsche Bank that ... caused CBL to do far more trading through Deutsche Bank than through other firms." *Id.* Even if the Receiver's allegation is true, it would prove at most that CBL was exploiting a weakness in Deutsche Bank's oversight and not that Deutsche Bank's policies were intentionally lax in order to encourage fraudulent deposits of shares.

### 4. The WWW Press Releases

The receipt of the press releases issued by World Wide Wireless Communications on August 10 and August 26, 1999 would create even more suspicion than the WWW Letter, which only aimed to put Deutsche Bank on notice that the WWW shares were restricted and had been pledged as collateral. Beginning on August 10, WWW gave public notice that CBL was short-selling shares of WWW stock in violation of "the Credit Facility Agreement entered into between Credit Bancorp and the shareholder [and] the

Trust Agreement related to the credit facility." Eiseman Decl. Exh. 32 (8/10/99 WWW press release). Unless such allegations could be determined to be baseless, such information is sufficient to put the transferee on notice "that the transfer violates the other party's property interest." Official Comment 2 to U.C.C. § 8–105. The August 26 press release announcing a lawsuit against Blech, CBL and others making the same charges would serve equally, if not more effectively, to put Deutsche Bank on notice of an adverse claim.

Unlike the WWW Letter, there is uncontradicted evidence that Houben saw both press releases. Blech testified before this Court that Houben had faxed a copy of the first press release to him on or about August 10, 1999, and that Houben and Blech talked by telephone about the second press release on or about August 26, 1999. (6/23/03 Tr. at 138, 141). Deutsche Bank has not denied that communication between Houben and Blech took place regarding the two press releases, apart from a generalized attack on Blech's credibility as a witness. Instead, Deutsche Bank argues that Houben's follow-up was adequate:

> With respect to Worldwide Wireless, it's not true that Deutsche Bank didn't do anything. In fact, it was Mr. Blech who said that it was Mr. Houben who sent him the press release and said, Look, I saw this press release, and, according to Mr. Blech, crediting his testimony, the securities are in the account, and they proceeded to have a conversation. There was no specific instruction pending in the account, but he was following up. He saw the press release and he wanted to know if there were any issues that he should be aware of.

> The bottom line of Mr. Blech's testimony, as he said, was I told Mr. Houben

there's nothing for you to be concerned about, and he never told Mr. Houben that there was anything to be concerned about. The case was settled.

*Id.* at 260–61 (Windels Oral Arg.). In the absence of a dispute over whether Houben saw the two press releases very shortly after their Release, Blech's testimony on this point is credible.

Houben has, nevertheless, denied that he had actual knowledge of an adverse claim against any of the securities in the CBL Account:

> Q: Is it your testimony that during the entire time that you were working on the Credit [Bancorp] account that nothing ever occurred that caused you to be concerned that securities were being deposited into the account might have actually belonged to somebody other than Credit [Bancorp]?
>
> MR. WINDELS: Is this up until the [11/17/99] Wall Street Journal article?
>
> MR. EISEMAN: Correct.
>
> A: No.

Eiseman Decl. Exh. 50 at 527. The implication is that by contacting Blech following his learning of the two press releases and being reassured by Blech that there was nothing to be worried about, Houben was reassured that no adverse claim existed against the WWW shares, or any other shares in the CBL Account. In the face of very specific allegations by WWW, and Houben's stated belief that Blech was trading only in family assets, Houben's disclaimer of knowledge lacks credibility. In any case, Houben did not have to actually be suspicious to trigger notice of an adverse claim. Even if actual knowledge of an adverse claim is not imputed to Houben because he never examined the Credit Facility Agreement ("CFA") between CBL and WWW, Houben was certainly "aware of facts sufficient to indicate that there is a significant probability that an adverse claim exist[ed] and deliberately avoid[ed] information that would establish the existence of the adverse claim." U.C.C. § 8–105(a)(2).

Deutsche Bank argues that by initiating contact with Blech, Houben was not willfully blind. However, by Deutsche Bank's own account, the entirety of Houben's follow-up consisted of two phone calls to Blech (with other CBL employees, including Shoukry, on speaker phone). Deutsche Bank thus maintains that Blech's oral assurances were sufficient to allay Houben's concerns. Houben also maintains that "Deutsche Bank did not ever sell any WWW shares short in any of the Credit Bancorp accounts," (6/20/03 Tr. at 25), directly contradicting Blech's testimony. (*See* 6/23/03 Tr. at 133–36). Even if it were true that Deutsche Bank did not short the stock, that would not relieve Houben of the responsibility of at least examining a copy of the CFA or the Trust Agreement that was the subject of the dispute between CBL and WWW.[8] The conduct alleged by WWW is so far afield of the image of CBL that Blech had created for Houben that it was incumbent upon Houben to seek some kind of confirmation outside of CBL that the claims made by WWW were baseless.

When Houben testified regarding the opening the CBL Account at Deutsche Bank, he acknowledged that he never discussed ownership of the shares or interests that other parties might have in the

---

8. The mere allegation by WWW of the existence of a CFA between WWW and CBL is enough to create suspicion about adverse claims to the WWW shares, as Blech has testified that he never discussed with Houben the existence of the CFAs by which CBL obtained the securities it deposited at Deutsche Bank, let alone the terms of those agreements. (6/23/03 Tr. at 164).

shares, explaining that "I didn't want to offend a client." *Id.* at 50–51.[9] A similar dynamic may well have been at work in August of 1999. Houben became good friends with Basil Shoukry at CBL, and Houben even spoke to Shoukry about "possibly getting a position" at CBL. *Id.* at 52, 57. But the awkwardness of the encounter, or even the negative consequences that may have followed from requiring Blech to verify the representations he was making to Houben do not excuse Houben's failure to seek objective confirmation of Blech's assurances. Neither does Houben's statement that "[t]he ownership of shares is a question that I do not spend my time answering." Houben Dep. at 250 (quoted in 6/20/03 Tr. at 47). After receiving the WWW press releases, Houben deliberately avoided answering the question of the ownership of shares in the CBL and Tasin Accounts.

The Court finds that Houben, and therefore Deutsche Bank, were on notice of an adverse claim by World Wide Wireless Communications to the shares of WWW in the CBL Account at Deutsche Bank from the time that Houben failed to seek confirmation of Blech's oral assurances that there was nothing to be concerned about regarding the WWW shares.

### 5. Receipt of the CFAs by Deutsche Bank

Even more than any of the preceding documents, the receipt by someone responsible for the CBL Account at Deutsche Bank of the CFAs which CBL had been using to defraud investors would amount to extremely strong evidence of an adverse claim to the securities in the CBL Account.

However, no one responsible for the CBL Account ever saw the CFAs which had been provided by a client and a potential client of Deutsche Bank. While the evidence shows that the CFAs were circulated to various individuals before reaching Deutsche Bank's compliance and legal departments, the individuals who saw the CFAs had nothing to do with the management of the CBL Account. There is no indication that Deutsche Bank deliberately withheld the CFAs from those responsible for the CBL Account. The documents were given to Deutsche Bank by a client and a potential client looking either for an assessment of CBL's claims or to inquire whether Deutsche Bank could make a similar offer. The context of their receipt would not lead Deutsche Bank to investigate whether CBL had an account with Deutsche Bank. The fact that neither Houben nor Hoddinott was notified is entirely innocent. The receipt of the CBL CFAs by Deutsche therefore did not contribute to putting Deutsche Bank on notice of an adverse claim.

### The Effect of Notice of an Adverse Claim to the WWW Shares on Other Securities in the CBL Account

### 1. Deutsche Bank Had Notice of an Adverse Claim to All Securities in the CBL Account as a Result of the WWW Press Releases

Deutsche Bank argues that having notice of an adverse claim to a single security is not sufficient to charge Deutsche Bank with notice of every security transferred into the account after that date. The Receiver argues conversely that by the time Deutsche Bank had notice of an adverse claim to the WWW shares, notice is given as to all other security interests arising subsequently because the notice "implicated CBL in a potentially wide-ranging de-

---

**9.** Houben also allowed CBL to open its account at Deutsche Bank despite the fact that he never received any written documentation from Blech on the extent of Blech's purported family wealth. *See id.* at 37–38.

ceit." Receiver Mem. at 61. While arguing that Deutsche Bank was on notice as of December 1998, SECO makes essentially the same argument.

Deutsche Bank claims that notice of an adverse claim to the WWW securities cannot be extended constructively to other securities without ignoring the "actual knowledge" or "willful blindness" standards of U.C.C. § 8–105. Because no party has proffered any evidence that Deutsche Bank had notice of an adverse claim with respect to the Vintage shares, Deutsche Bank's interest in the Vintage shares must be considered secure. But the Receiver does not argue that Deutsche Bank was on notice as to the Vintage shares, but only to the securities transferred into the CBL and Tasin accounts after being put on notice in August 1999.

In support of their respective positions, the parties cite different excerpts from commentary on the U.C.C. by a leading authority. *See* William D. Hawkland, et al., 7A *Hawkland UCC Series Rev.* § 8–105:03 (2003). The commentary refers to U.C.C. § 8–105(a)(3), which concerns the statutory or regulatory duty of inquiry. While all parties agree that (a)(3) is not the relevant subsection, the examples may be generalized to situations where notice has been charged to a transferee as to one security while adverse claims exist as to other securities. SECO and the Receiver cite the following hypothetical:

(1) Borrower offers to pledge certificate A to Bank, Bank checks the SIC registry and finds certificate stolen, but Bank takes certificate A in pledge anyway. (2) Later, the same Borrower offers to pledge certificate B to Bank. Bank fails to check the SIC registry, but certificate had not (yet) been reported stolen. Even though a check of the stolen registry would not disclose that certificate B was stolen, the fact that the purchaser knew that certificate A has been reported stolen should suffice to preclude Bank from adverse claim protection with respect to certificate B as well.

*Id.* The rationale for Hawkland's conclusion is that failure to check the registry for certificate B constitutes willful blindness once the fact that certificate A is stolen is known.

Deutsche Bank argues that the facts are more nearly analogous to the subsequent hypothetical proposed by Hawkland, in which the Bank fails to check the registry for both certificate A and certificate B. In such circumstances, Hawkland initially suggests that "it would be hard to base a finding of notice of an adverse claim to certificate B on the willful blindness test, because the test comes into play only if the purchaser 'is aware of' facts sufficient to indicate a significant probability of an adverse claim." *Id.*

While neither hypothetical accurately captures the facts in the instant case, the hypothetical cited by SECO and the Receiver more closely conforms to the facts as found by the Court. Deutsche Bank, via Houben, did not have actual knowledge of an adverse claim to the WWW shares, unlike the Bank checking the registry for certificate A. However, because Deutsche Bank was aware of facts indicating a significant probability of an adverse claim to the WWW shares, it was incumbent on Houben or any other individual responsible for the CBL Account to verify not only that Blech's story checked out as to the WWW shares, but as to other security interests that arose subsequently. As indicated above, such an inquiry could have been as simple as looking into the existence of CFAs such as the ones alleged in the WWW press releases. Such an analysis accords with the conclusion of the hypothetical cited by Deutsche Bank, which revises the initial finding of no notice:

The owner of certificate B, however, might prevail in a contention where Bank is charged with notice of the adverse claims, both to certificate A and certificate B, in that had Bank checked the SIC registry in the first transaction, it would thereby have learned that certificate A was stolen. Perhaps that fact alone should suffice, under subsection 8–105(a)(3) as well.

*Id.*

In the present case, Houben did not have a regulatory or statutory duty of inquiry, but under subsection (a)(2), he had an obligation not to avoid information which would have confirmed adverse claims not only to WWW, but to all other securities in the CBL and Tasin Accounts. The allegations in the WWW press releases suggest that CBL had concealed from Deutsche Bank the fact that 2.65 million shares of stock that CBL had pledged as collateral for CBL's margin debt, did not belong to CBL and were subject to Rule 144 restrictions. They reveal to Deutsche Bank that CBL allegedly agreed that a trustee named Brandon would hold the WWW shares. When coupled with CBL's trading activity, they suggest that CBL was breaching its contractual obligations by selling stock that had been pledged to CBL as security for a loan that was not in default. They also suggest that the assurances concerning the source of CBL's assets, which Houben claims to have received from Blech and other CBL representatives, were false.

Under these circumstances, Houben clearly was required to seek confirmation beyond the guarantees of the very person accused of impropriety. Given the seriousness of the accusations, and the extent to which they present Blech's enterprise in a manner significantly different from Houben's prior understanding, it was further incumbent upon Houben not to avoid information which would have established adverse claims to every other security which was subsequently transferred into either the CBL or the Tasin Accounts. By not undertaking any inquiries apart from two phone calls to Blech, Houben thereby put Deutsche Bank on notice of an adverse claim to all securities after Blech and Houben spoke regarding the first WWW press release.

## 2. Margin Loans Extended After Deutsche Bank Was On Notice of An Adverse Claim Are Unsecured

Deutsche Bank argues that even if it had notice of an adverse claim to particular securities in the CBL Account, that notice cannot be extended to create notice of an adverse claim to the shares of Vintage Petroleum in the account, or to any other security interest in the account that was created *before* Deutsche Bank had notice of an adverse claim. And because Deutsche Bank has only requested leave to sell the Vintage shares to cover CBL's margin debt, Deutsche Bank claims that notice of the other adverse claims is irrelevant.

Deutsche Bank misunderstands the basis for the claim on the Vintage shares. While Deutsche Bank cannot be charged with notice as to the Vintage shares themselves, notice has been charged as to all security interests which arising on Deutsche Bank's behalf after approximately August 11, 1999. The effect of the notice is not only to render unprotected the securities transferred into the account after that date, but also to render unsecured any margin loans made once Deutsche Bank was on notice.

As the Receiver argues, the liens created by the margin loans are themselves security entitlements under Revised Article 8 of the U.C.C. It follows then that "[e]ach time Deutsche Bank extended additional credit to CBL, there was an in-

crease in the amount of Deutsche Bank's lien and, therefore a 'purchase' of an additional 'interest' in the CBL assets, within the meaning of § 8–510(a)." Receiver Mem. at 65. Once Deutsche Bank is charged with notice of an adverse claim, the protections of § 8–510 do not extend to liens created subsequently.

The margin loans extended after Deutsche Bank was on notice of an adverse claim are unsecured because the collateral on which Deutsche Bank based its extension of credit to CBL was, in effect, corrupted by the presence of securities which were not properly available as collateral for a loan. Had Deutsche Bank acted properly, the questionable securities would not have come into the Tasin Account, or at least not into an account which could be used as collateral. Under those circumstances, Deutsche Bank almost certainly would not have extended further credit to CBL because it could no longer be assured that it could properly sell the securities CBL attempted to pledge as collateral.

Deutsche Bank argues in effect that the collateral CBL pledged for its margin loans can be retroactively divided into "good collateral," because pledged before notice of an adverse claim, and "bad collateral," because pledged subsequently. Because there is sufficient good collateral to cover the loans extended to CBL both before and after the date Deutsche Bank was charged with notice, Deutsche Bank argues that it may act as if the post-notice loans had been extended based only on the good collateral.

If Deutsche Bank had specified that its post-notice loans were based only on collateral placed in accounts before it was on notice, such an argument might be plausible. Because Deutsche Bank has never acknowledged being on notice, that never happened. To allow Deutsche Bank to make such a division afterward would be to reward it for extending credit based on securities it should have known to be fraudulently obtained.

Deutsche Bank argues that because the margin agreements CBL entered into with Deutsche Bank allow Deutsche Bank to sell, at its discretion, "any or all" securities in the account to cover the margin loans, they are entitled to choose the Vintage shares, or any other securities deposited in the account pre-notice. But such an argument presumes that Deutsche Bank has a secured interest in the post-notice loans. The provision giving Deutsche Bank discretion to sell whatever securities it chooses cannot create a secured interest where one would not otherwise arise. That provision instead serves the limited function of allowing Deutsche Bank to make financially prudent decisions as to which stocks to hold and which to sell, despite the fact that when the margin loans were in good standing the transferee would not otherwise have discretion to buy and sell stocks, and instead could only enter into transactions on the account holder's orders.

As the Receiver argues, Deutsche Bank cannot divide its security interest in the margin loans extended post-notice. Instead,

> Deutsche Bank's lien on each security in the CBL Account is an inchoate interest that arises both from the loans extended before Deutsche Bank received notice of an adverse claim and [from] loans extended after that time. With respect to each security, therefore, the portion of Deutsche Bank's lien purporting to secure loans [extended to CBL] after August 1999, is subordinate to the adverse claims of the Receiver and CBL's customers. If, therefore, any security were sold from the CBL Accounts, Deutsche Bank would be entitled to retain only

that portion of the proceeds attributable to loans extended prior to August 1999. Receiver Mem. at 68.

To support this claim, the Receiver argues by analogy to U.C.C. Article 9, which covers secured transactions and the rights of parties to a security agreement. The provisions of the Code relating to "future advances," [10] and the interpretations of commentators, bolster the commonsensical proposition that "a lender [may not] continue making secured loans on the basis of collateral once the lender has received notice of an adverse claim to that collateral." Receiver Mem. at 66; *see also* U.C.C. § 9–323(b); 8 *Hawkland Uniform Commercial Code Series,* § 9–204:5 (2001) ("[The purpose of section 9–301(4) [the predecessor provision to 9–323(b)]], is to require the secured party to check to determine whether a lien has been filed against the debtor before the secured party makes his advance. If a lien has been filed, the secured party obviously should not make the advance..."). Deutsche Bank's counters that the analogy to future advances in Article 9 fails because the duty to investigate liens is rejected in Article 8. That argument is unavailing because it has already been established that Deutsche Bank had at least an obligation not to avoid information confirming the existence of an adverse claim. Such an obligation is sufficient to make the analogy proposed by the Receiver persuasive.

Because the loans extended by Deutsche Bank to CBL after it was on notice of an adverse claim are rendered unsecured by that notice, Deutsche Bank's request for leave to sell the Vintage shares is denied, except to the extent that the shares are sold to cover loans extended before Deutsche Bank was put on notice of an adverse claim.

### Deutsche Bank Must Refund the Proceeds of the Praegitzer Tender Offer

The Praegitzer shares were tendered in December 1999 in violation of the SEC's Freeze Order. *See CBL I,* 290 F.3d at 85 n. 6. Shares were tendered from both the CBL and the Tasin Accounts. Because the shares from the Tasin Account were deposited there in late September 1999, after Deutsche Bank was on notice of an adverse claim, the Receiver has requested that Deutsche Bank be directed to refund the proceeds from the sale, amounting to $3,459,000, together with interest thereon. Deutsche Bank argues that "[r]efunding the proceeds would simply increase the outstanding margin loans..." Deutsche Bank Reply at 36.

The entire premise of Deutsche Bank's argument against refunding the shares is that it is entitled to sell any amount of the Vintage shares in order to pay down the margin loan. Because the loans extended post-notice are unsecured, Deutsche Bank's ability to sell the Vintage shares is correspondingly limited. Deutsche Bank is therefore directed to refund the proceeds from the sale of the Praegitzer shares from the Tasin Account, together with interest thereon.

### CONCLUSION

The Court orders the following:

(1) The parties are directed to meet and confer to determine the exact date in August 1999 when Deutsche Bank was on notice of an adverse claim, in light of the Court's determination that Deutsche Bank had notice after Reindert Houben failed to seek further information which would have confirmed the truth of the allegations in the first World Wide Com-

---

**10.** A future advance is "money secured by an original security agreement even though it is lent after the security interest has attached." *Black's Law Dictionary* 685 (7th ed.1999).

275

munications press release, issued on August 10, 1999.

(2) Deutsche Bank's claimed security interest in all assets received into the CBL Account and the Tasin Account after Deutsche Bank had notice of an adverse claim are declared invalid. Because Deutsche Bank does not have a valid interest in these assets, Deutsche Bank is directed to transfer the assets to an account designated by the Receiver.

(3) All margin loans extended by Deutsche Bank in the CBL and Tasin Accounts after Deutsche Bank was on notice of an adverse claim are declared unsecured.

(4) Deutsche Bank is directed to refund to the Tasin Account the proceeds from the tendering of the Praegitzer shares from that account in December 1999, together with interest thereon. Deutsche Bank is entitled to a credit in the same amount as an unsecured creditor.

For the reasons set forth above, the motion of the Receiver is granted in part, the motion of Deutsche Bank is denied and the motion of SECO is granted in part and denied in part.

It is so ordered.