386 F.3d 438
 SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
CREDIT BANCORP, LTD., Credit Bancorp, Inc., Richard Jonathan Blech, Thomas Michael Rittweger, Douglas C. Brandon, Defendants.
Deutsche Bank Securities, Inc., Intervenor-Appellant-Cross-Appellee,
Credit Bancorp, Ltd., Credit Bancorp, Inc. and Carl H. Loewenson, Jr., Court-Appointed Receiver for Credit Bancorp Ltd., Credit Bancorp, Inc., Defendants in Intervention-Appellees.
Stephenson Equity Company, Intervenor-Plaintiff-Appellee-Cross-Appellant.
 Docket No. 03-6208(L).
 Docket No. 03-6222(XAP).
 United States Court of Appeals, Second Circuit.
 Argued: May 24, 2004.
 Decided: October 18, 2004.
 
 Appeal from the United States District Court for the Southern District of New York, Robert W. Sweet, J. COPYRIGHT MATERIAL OMITTED James H.R. Windels, Davis Polk & Wardwell, New York, N.Y. (David B. Toscano, on the brief), for Intervenor-Appellant-Cross-Appellee.
 David J. Eiseman, Golenbock, Eiseman, Assor, Bell & Peskoe LLP, New York, N.Y. (Adam C. Silverstein, on the brief), for Defendant in Intervention-Appellee Carl H. Loewenson, Jr.
 T. Lane Wilson, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, OK, for Intervenor-Plaintiff-Appellee-Cross-Appellant.
 Before: VAN GRAAFEILAND, KEARSE, and WESLEY, Circuit Judges.
 WESLEY, Circuit Judge.
 
 
 1
 A lender holding securities as collateral for a loan is protected from adverse claims to those securities if the lender "gives value, does not have notice of the adverse claim, and obtains control." U.C.C. § 8-510(a). In this appeal, we confront two significant issues involving the extent to which a secured lender is protected from adverse claims to its security. First, we must consider whether the district court properly determined that a lender was on general notice of adverse claims to all securities it held as collateral for loans to a debtor when press releases by a third party asserted claims to some of the securities and announced that two lawsuits had been filed against the debtor to recapture those securities. Secondly, we must determine whether and to what extent a lender retains its security interest when it extends loans to a fraudulent debtor both before and after it receives notice that third parties possess adverse claims to the debtor's collateral. We answer the former question in the affirmative and the latter by concluding that the lender's security interest with respect to loans issued pre-notice survives, but interests obtained by extending loans post-notice are invalid.
 
 I. Facts & Procedural History
 
 2
 The Securities and Exchange Commission (the "SEC") initiated the instant lawsuit on November 17, 1999 to freeze assets of Credit Bancorp, Ltd. and affiliated entities (collectively, "CBL") based on allegations that Richard Jonathan Blech and others engaged in a Ponzi scheme that defrauded more than two hundred CBL customers with interests in excess of $200 million.[1] As part of its fraudulent scheme, CBL placed customer-owned securities in CBL accounts maintained by several institutions, including Deutsche Bank.[2] Deutsche Bank and other institutions issued margin loans to CBL after receiving CBL customer-owned securities as collateral for the loans. The district court established an equity receivership of CBL's assets on January 21, 2000. Since that time, this case has been the subject of numerous opinions by this Court and the district court. The following is a partial list of district court opinions relevant to this case: SEC v. Credit Bancorp, Ltd., 279 F.Supp.2d 247 (S.D.N.Y. Aug.21, 2003) ("Credit Bancorp VI"); SEC v. Credit Bancorp, Ltd., 2002 WL 1792053, 2002 U.S. Dist. LEXIS 14033 (S.D.N.Y. Aug.2, 2002) ("Credit Bancorp V"); SEC v. Credit Bancorp, Ltd., 2001 WL 1658200, 2001 U.S. Dist. LEXIS 21717 (S.D.N.Y. Dec. 27, 2001) ("Credit Bancorp IV"); SEC v. Credit Bancorp, Ltd., 2000 WL 1752979, 2000 U.S. Dist. LEXIS 17171 (S.D.N.Y. Nov.29, 2000) ("Credit Bancorp III"); SEC v. Credit Bancorp, Ltd., 124 F.Supp.2d 824 (S.D.N.Y.2000) ("Credit Bancorp II"); SEC v. Credit Bancorp, Ltd., 194 F.R.D. 457 (S.D.N.Y.2000) ("Credit Bancorp I"). Additionally, this Circuit has issued two opinions in this case: SEC v. Credit Bancorp, Ltd., 297 F.3d 127 (2d Cir.2002) ("CBL II") and SEC v. Credit Bancorp, Ltd., 290 F.3d 80 (2d Cir.2002) ("CBL I"). We assume familiarity of the facts of each of these district and appellate court cases.
 
 1. CBL Credit Facility Agreements
 
 3
 As part of its Ponzi scheme, CBL induced its customers to deposit securities, cash, and other assets in trust by promising them a "custodial dividend" based on the profits of "risk-less" arbitrage. Credit Bancorp VI, 279 F.Supp.2d at 258 (internal quotation marks omitted). CBL's arrangement has been described as follows:
 
 
 4
 Credit Bancorp solicited customers to deposit securities, cash and other assets to be held in trust with the promise of a return in the form of a "custodial dividend" based upon a percentage of the market value of the deposits, as well as to invest cash and mutual funds to be managed by Credit Bancorp and invested at above-market rates .... Credit Bancorp promised customers who deposited securities that those securities would not be sold, pledged, hypothecated or otherwise encumbered. Credit Bancorp, contrary to its assurances, misappropriated the assets entrusted to it by the customers.
 
 
 5
 Id. (quoting Credit Bancorp III, 2000 WL 1752979, at *8-9, 2000 U.S. Dist. LEXIS 17171, at *25-28). The Credit Facility Agreement (the "CFA") between CBL and its customers, along with related materials, described CBL's scheme as one in which its customers would profit by allowing CBL to hold their assets as collateral for a line of credit, irrespective of whether the customer drew from this line of credit. Id. The Deutsche Bank legal department received a copy of the CFA on August 16, 1999. Id. In October 1999, the legal department received a second copy of the CFA from an independent source. Id. at 258-59. In each case, Deutsche Bank made copies of the CFA and distributed it to appropriate personnel for review. Id.
 
 2. Deutsche Bank Margin Account
 
 6
 One of the accounts CBL opened at Deutsche Bank was a margin account in which CBL purchased securities using margin loans provided by Deutsche Bank (the "Margin Account," and collectively with all other CBL accounts at Deutsche Bank, the "CBL Account"). Blech, on behalf of CBL, signed a margin agreement with Deutsche Bank on September 15, 1998 that granted Deutsche Bank a security interest in all of the securities held in the Margin Account. Id. at 250. On June 15, 1999, following Deutsche Bank's acquisition of Bankers Trust and its affiliates, CBL signed a new customer agreement that granted Deutsche Bank a lien on all CBL assets held by Deutsche Bank and the discretion to select securities for liquidation to enforce its security interest. Id.
 
 
 7
 Reindert Houben, a broker in Geneva, Switzerland, established Deutsche Bank's CBL Account.[3] Id. In establishing the CBL Account, Houben completed documents stating that the Margin Account did not contain third-party assets. Id. Subsequently, Houben confirmed his averments in the account documents when he testified that he understood CBL to be an investment vehicle used exclusively by the Blech family. Id. at 250-51.
 
 3. Tasin Account
 
 8
 CBL held 400,000 shares of stock in Vintage Petroleum, Inc. ("Vintage") in its account with Tasin & Co. (the "Tasin Account"), and held 2,000,000 shares of Vintage stock — pledged to it by Stephenson Equity Company ("SECO") — in the Margin Account (collectively, the "Vintage Shares"). Id. at 254. Deutsche Bank provided settlement services for the Tasin Account beginning in September 1999. Id. In connection with the account, CBL and Deutsche Bank entered into a margin agreement which granted Deutsche Bank a security interest in all of the securities held in the Tasin Account. Id. The terms of the margin agreement, governed by Maryland law, were similar in all material respects to the terms of the margin agreement for the CBL Margin Account, governed by New York law. Id.[4]
 
 4. Margin Loans
 
 9
 At all relevant times, Deutsche Bank's procedures for margin lending placed initial responsibility with the broker.[5] Id. Once a customer's loan balance exceeded $500,000, responsibility for the customer's loan requests was transferred to Deutsche Bank's credit department. Id. The credit department weighed the quality, diversification, liquidity, and price volatility of the customer's collateral when considering whether to extend additional credit. Id.
 
 
 10
 Deutsche Bank granted several CBL requests for more credit against both the Margin Account and the Tasin Account, though Deutsche Bank did not always extend credit for the full amount requested. Id. at 254-55. Generally, Thomas Hoddinott, Vice President of Credit for DBAB, was responsible for approving these credit increases. Id. at 255. CBL borrowed more than $21 million on margin in its accounts with Deutsche Bank. Id. As of March 31, 2003, this debt was reduced to $17.4 million, interest included. Id.
 
 5. Confiscation of the DCH Shares
 
 11
 On October 7, 1998, CBL transferred 450,000 shares of DCH Technology ("DCH") in the form of five DCH share certificates (the "DCH Certificates") to the CBL Account. Id. at 251. The certificates listed CBL as the record holder and were marked "Restricted."[6] Id. Because the DCH Certificates represented restricted shares, Deutsche Bank classified the shares as of a type that could not be used as collateral for margin loans. Id. at 251, 267. On November 16, 1998, CBL faxed Deutsche Bank a letter requesting that Deutsche Bank deliver the DCH Certificates to CBL's transfer agent so that the certificates could be re-registered in the name of Oxford International ("Oxford"), and, upon re-registration, returned to CBL's offices in New Jersey. Id. at 251. On December 9, 1998, Deutsche Bank requested authorization from Holladay Stock Transfer ("Holladay"), DCH's transfer agent, to transfer the DCH Certificates. Id. Holladay informed Deutsche Bank that on November 10 and 11, 1998, DCH's president wrote to Holladay requesting that the DCH certificates be cancelled because Oxford had not yet paid for the DCH shares, even though the certificates had been outstanding since approximately August 1998. Id.
 
 
 12
 On December 15, 1998, Blech sent a letter to Deutsche Bank requesting that the DCH Certificates be returned to the transfer agent and reissued in DCH's name because Oxford had failed to meet its payment obligations. Id. at 252. Deutsche Bank relayed this message to Holladay, which, accordingly, cancelled the DCH certificates. Id. Deutsche Bank listed the DCH shares as "confiscated" in its CBL account statement, removed the shares from its books, and closed out the transaction. Id.
 
 6. Blech and Praegitzer Letters
 
 13
 On November 30, 1998, Blech faxed Deutsche Bank a letter (the "Blech Letter"), written on CBL letterhead, requesting that Deutsche Bank prepare to accept on behalf of CBL 200,000 shares of Praegitzer Industries, Inc. ("Praegitzer"). Id. The next day, Praegitzer faxed Deutsche Bank a letter (the "Praegitzer Letter") explaining that the Praegitzer shares were subject to Rule 144 restrictions, even though they were not so marked. Id. at 252-53. No one at Deutsche Bank acknowledges receipt of the Praegitzer Letter. Id. at 253, 268.[7]
 
 
 14
 Deutsche Bank holds restricted shares in accounts separate from those that hold unrestricted shares, and generally does not use restricted shares as collateral for margin loans because of the risk that restricted shares might not sell easily. Id. at 251 (citing Windels Supp. Decl. Exh. 2; Hoddinott Dep. at 64-65). Yet, when Deutsche Bank received the Praegitzer shares, it put the shares into the Margin Account, which increased the amount of collateral on which Deutsche Bank extended margin loans to CBL. Id. at 253.
 
 7. Transfer of Vintage Shares
 
 15
 On June 21, 1999, SECO instructed its broker, Merrill Lynch, to transfer two million shares of Vintage stock into the CBL Margin Account through the Depository Trust Company ("DTC") electronic bookentry system. Id. These Vintage shares were restricted under Rule 144, but SECO did not notify Merrill Lynch of this fact when it instructed Merrill to transfer the shares via the DTC. Id. DTC would not have permitted the transfer of these shares if it had known of their restrictions.[8] Id. at 253-54. The DTC required that shares transferred through its electronic system be free of adverse claims. Id. at 254 (citing DTC Services Guide § B000 ("By depositing a certificate at DTC, Participants warrant and represent to DTC that ... the certificates are in good deliverable form ... [.]")). Thus, by transferring Vintage stock through the DTC, SECO achieved an ownership transfer in these shares to CBL. Credit Bancorp VI, 279 F.Supp.2d at 253 (citing CBL I, 290 F.3d at 87).
 
 8. World Wide Wireless Communications
 
 16
 On July 29, 1999, Deutsche Bank received 2,650,000 shares of World Wide Wireless Communications ("WWW") on behalf of CBL. Id. at 255. In early August, CBL sold nearly 300,000 shares of WWW in several separate transactions. Id.
 
 
 17
 (A) WWW Letter
 
 
 18
 On August 11, 1999, Paul Manasian, a lawyer representing WWW, sent a letter to Deutsche Bank claiming that WWW owned the WWW shares in CBL's Margin Account. Id. Manasian explained that WWW pledged the shares, which were restricted under Rule 144 and the Securities Act of 1933, to CBL as collateral for a loan to Worldwide Wireless, Inc., a WWW shareholder. Id. Pursuant to an agreement between CBL and WWW, WWW stripped the shares of their restrictive legend, and a trustee was appointed to inform prospective purchasers of the restrictions on the shares. Id. at 255-56. Manasian faxed this letter to Timothy J. Caffrey, a Deutsche Bank Managing Director, to put Deutsche Bank on notice that the shares should not be sold or margined because CBL did not own them. Id. at 256.
 
 
 19
 Manasian's assistant testified that she received telephonic confirmation that Caffrey's office received the faxed letter. Id. Deutsche Bank asserts that Caffrey was on vacation at the time and that neither he nor anyone at Deutsche Bank ever received the fax. Deutsche Bank never responded to the letter. Id.
 
 
 20
 (B) WWW Press Releases and Lawsuits
 
 
 21
 On August 10, 1999, WWW issued a press release announcing that it was investigating short sales of WWW stock by CBL through CBL's brokers. Id.[9] The press release denied the truth of a prior assertion by CBL that the short sales arose out of an agreement between CBL and a major WWW shareholder. Id. at 256-57. It further stated that the CFA between CBL and the shareholder and the related Trust Agreement did not authorize sale of the WWW shares. Id. at 257.
 
 
 22
 On August 26, 1999, WWW filed a lawsuit against CBL, Blech and others in the United States District Court for the Northern District of California for permanent injunctive relief, asserting claims of defamation and fraud. Id. The company issued a press release that same day describing its lawsuit against CBL, as well as a separate suit against CBL filed by WWW's parent. Id. Describing in substantial detail these lawsuits, the press release explained that pursuant to the CFA, WWW pledged restricted WWW shares to CBL as collateral for a loan, and that the Trust Agreement between the parties required the trustee, Douglas Brandon, to inform any broker/dealer receiving the pledged shares that they were restricted shares to be held by CBL as collateral for a loan extended to WWW. Id. The company maintained in the press release that Brandon failed to notify the broker-dealers of the circumstances surrounding the WWW shares, despite WWW's repeated requests for him to do so. Id. Further, WWW contended that CBL had warranted that it would not improperly use the restricted shares or engage in short selling that would affect WWW's share price. Id. The press release explained that WWW sought to rescind the CFA and cause its pledged shares to be returned. Id.
 
 
 23
 On or about August 10, 1999, Houben faxed a copy of the first press release to Blech. Id. Houben and Blech then spoke by telephone about CBL's position concerning allegations in the press release. Id. On or about August 26, 1999, Houben and Blech spoke about the second press release. Id. When Houben asked about the short selling allegations, Blech claimed that he believed WWW was aware that CBL would short sell WWW stock to obtain loan funds. Id. When Houben asked about the share restrictions, Blech said "the restriction issue is between CBL and the counterparty." Id. (internal quotation marks omitted). Deutsche Bank continued to extend credit to CBL without further inquiry into the allegations made in the press releases or the lawsuits. Id.
 
 9. Motions Leading to the Instant Appeal
 
 24
 This appeal arises out of an order by Judge Robert Sweet in Credit Bancorp VI in which Judge Sweet ruled on several motions submitted by the parties.
 
 
 25
 On April 11, 2003, Deutsche Bank moved for an order declaring valid its security interest in the Vintage Shares and for leave to sell the shares to satisfy CBL's approximately $17.4 million debt to Deutsche Bank stemming from the margin loans, interest thereon, and collection costs. Deutsche Bank's motion reflected its contention that, since the Vintage Shares were obtained without notice of adverse claims, any subsequent notice did not affect its interest in the Vintage Shares as collateral for loans issued preor post-notice.
 
 
 26
 On April 14, 2003, Carl H. Loewenson, Jr., Esq., the court-appointed receiver (the "Receiver") for CBL moved for an order (1) directing Deutsche Bank to transfer to the Receiver all assets transferred into Deutsche Bank accounts in the name of CBL after August 11, 1999, (2) declaring unsecured all margin loans, including accrued interest, secured by such CBL accounts and extended after August 1999, and (3) directing Deutsche Bank to credit to an account of the Receiver proceeds realized from the tender of 200,000 Praegitzer shares, which occurred in December 1999. This motion reflected the Receiver's assertion that Deutsche Bank was on notice in August 1999 — when the WWW press releases were issued — of adverse claims to securities held by Deutsche Bank as collateral for loans issued to CBL. As a result of this alleged notice, the Receiver sought an order from the district court declaring invalid all security interests asserted by Deutsche Bank arising out of loans issued after August 1999.
 
 
 27
 On May 2, 2003, SECO cross-moved for an order (1) directing Deutsche Bank to transfer all CBL assets received after December 1, 1998, (2) declaring unsecured all margin loans, including accrued interest, extended to CBL by Deutsche Bank after December 1, 1998, and (3) directing Deutsche Bank to credit CBL's Deutsche Bank account with the proceeds from the sale of the Praegitzer shares. SECO's motion reflected its contentions that the Receiver's equitable powers supersede Deutsche Bank's claimed U.C.C.-based security interests, and, alternatively, that even if the U.C.C. governed, Deutsche Bank was on notice of adverse claims to the CBL collateral as of December 1998, when the Praegitzer Letter was faxed to Deutsche Bank.
 
 
 28
 The district court granted the Receiver's motion in part, finding that Deutsche Bank was on notice as of August 1999 of adverse claims to stocks held by Deutsche Bank in the CBL Margin Account and declaring unsecured all loans issued post-notice. The court ordered Deutsche Bank to refund the proceeds, with interest, from the tender of 200,000 Praegitzer shares and denied Deutsche Bank's motion, while it granted in part and denied in part SECO's motion.
 
 
 29
 Deutsche Bank has appealed, contending principally that the district court erred in ruling that it had notice in August 1999 of adverse claims against the shares it held in CBL's Margin Account as collateral. SECO has cross-appealed from so much of the district court's order as failed to find that Deutsche Bank had the requisite notice as early as December 1998, renewing its contentions that (1) Deutsche Bank's claims should be rejected as a matter of equity, and (2) even if the U.C.C. was controlling during that period, Deutsche Bank had sufficient notice of adverse claims as early as December 1998. We reject SECO's first claim essentially for the reasons stated by the district court, see id. at 261, to wit, that "a receiver appointed by a federal court takes property subject to all liens, priorities, or privileges existing or accruing under the laws of the State." Marshall v. People of New York, 254 U.S. 380, 385, 41 S.Ct. 143, 65 L.Ed. 315 (1920); see, e.g., Lankenau v. Coggeshall & Hicks, 350 F.2d 61, 66-67 (2d Cir.1965) (stating a federal court receiver takes property subject to a perfected lien or other established priority right). The district court correctly ruled that the U.C.C. and the language of the agreements, rather than the law of federal equity receivership, govern the dispute. We reject SECO's second contention and the contentions of Deutsche Bank for the reasons that follow.
 
 II. Discussion[10]
 
 30
 Article 8 of the U.C.C. (also referred to herein as the "Code") sets forth rules governing the rights and obligations of parties in connection with the issuance and transfer of stocks, bonds, and other forms of debt commonly traded by investors. See 7A W. Hawkland Uniform Commercial Code Series § 8-101:01 (2002). According to Article 8, a "security entitlement" refers to the "rights and property interest of an entitlement holder with respect to a financial asset." U.C.C. § 8-102(a)(17). "Financial asset" is a broad term that includes, inter alia, "any property that is held by a securities intermediary for another person in a securities account if the securities intermediary has expressly agreed with the other person that the property is to be treated as a financial asset under [Article 8]." U.C.C. § 8-102(a)(9)(iii). An "entitlement holder" is a "person identified in the records of a securities intermediary as the person having a security entitlement against the securities intermediary." U.C.C. § 8-102(a)(7). A "securities intermediary" is a "clearing corporation" or "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity." U.C.C. § 8-102(a)(14). A "securities account" is "an account to which a financial asset is or may be created in accordance with an agreement under which the person maintaining the account undertakes to treat the person for whom the account is maintained as entitled to exercise the rights that comprise the financial asset." U.C.C. § 8-501(a).
 
 
 31
 In the instant matter, Deutsche Bank is a securities intermediary, and CBL is an entitlement holder of security entitlements to the assets in the Margin and Tasin Accounts, each of which is a securities account. Credit Bancorp VI, 279 F.Supp.2d at 262. Pursuant to agreements with CBL, Deutsche Bank purchased a security interest in all of the financial assets in the Margin and Tasin Accounts. Id. at 250, 254, 263.
 
 1. Willful Blindness of Adverse Claims
 
 32
 At the district court, the parties agreed that whether Deutsche Bank's interest in the CBL and Tasin Accounts is protected by the Code's notice provision — U.C.C. § 8-510 — hinges on whether Deutsche Bank had notice of adverse claims in the CBL Account. Id. at 263. The Code provides:
 
 
 33
 [A]n action based on an adverse claim to a financial asset or security entitlement, whether framed in conversion, replevin, constructive trust, equitable lien, or other theory, may not be asserted against a person who purchases a security entitlement, or an interest therein, from an entitlement holder if the purchaser gives value, does not have notice of the adverse claim, and obtains control.
 
 
 34
 U.C.C. § 8-510(a). The U.C.C. defines an adverse claim as "a claim [where] a claimant has a property interest in a financial asset and that it is a violation of the rights of the claimant for another person to hold, transfer, or deal with the financial asset." U.C.C. § 8-102(a)(1). The Code provides:
 
 
 35
 A person has notice of an adverse claim if: (1) the person knows of the adverse claim;
 
 
 36
 (2) the person is aware of facts sufficient to indicate that there is a significant probability that the adverse claim exists and deliberately avoids information that would establish the existence of the adverse claim; or
 
 
 37
 (3) the person has a duty, imposed by statute or regulation, to investigate whether an adverse claim exists, and the investigation so required would establish the existence of the adverse claim.
 
 
 38
 U.C.C. § 8-105(a). Simply being aware of another party's property interest is not sufficient to establish notice of an adverse claim; rather, "[t]he transferee must be aware that the transfer violates the other party's property interest." U.C.C. § 8-105 cmt. 2.
 
 
 39
 At issue in this appeal is whether Deutsche Bank had notice under U.C.C. § 8-105(a)(2). The Code describes this "willful blindness" test as the codification of a two-prong test developed in cases decided more than a century ago. See U.C.C. § 8-105 cmt. 4 (citing May v. Chapman, 16 M. & W. 355, 153 Eng. Rep. 1225 (1847), and Goodman v. Simonds, 61 U.S. 343, 20 How. 343, 15 L.Ed. 934 (1857)). The first prong considers whether the person was aware of sufficient facts to indicate a "significant probability" of an adverse claim. Id. The second prong considers whether the person deliberately avoided information that would establish an adverse claim. Id. The two-part test does not impose a duty of inquiry or due diligence absent circumstances giving rise to a reasonable suspicion. See, e.g., In re Legel, Braswell Gov't Sec. Corp., 648 F.2d 321, 327-28 (5th Cir. Unit B June 1981) (U.C.C. does not impose duty of inquiry where certificates are pledged without restriction). Although the U.C.C. does not require that knowledge held by employees of an organization be imputed to the organization as a whole, an entity that "acts to preclude or inhibit transmission of pertinent information to those individuals responsible for the conduct of purchase transactions" may be deemed to have deliberately avoided information. U.C.C. § 8-105 cmt. 4.
 
 
 40
 The relevant people for establishing whether Deutsche Bank had notice of an adverse claim are "the officers or agents who conducted th[e] purchase transaction." U.C.C. § 8-105 cmt. 4. In this case, those individuals are Reindert Houben and Thomas Hoddinott. Credit Bancorp VI, 279 F.Supp.2d at 266. Houben was the broker responsible for opening the CBL Account and the account representative until the SEC filed suit against CBL. Id. Thomas Hoddinott was, at all relevant times, the Vice President of Credit for DBAB. Id. He worked in the department that oversaw CBL's margin borrowing and the CBL securities used as collateral. Id. Hoddinott personally approved most of the credit line increases granted by Deutsche Bank to CBL. Id.[11]
 
 
 41
 The district court examined five distinct events and considered whether they, individually or collectively, put Deutsche Bank on notice of the existence of an adverse claim: (1) confiscation of the DCH shares, (2) the Blech and Praegitzer Letters regarding the Praegitzer shares, (3) the WWW Letter, (4) the WWW press releases and lawsuits, and (5) receipt by Deutsche Bank's legal department of two copies of CBL's CFA. Id. at 265-67. We examine below all but event five, because that event has no bearing on the analysis herein, and we add to the list "opening of the CBL account" as an event we consider.
 
 
 42
 (A) Pre-August 1999
 
 
 43
 SECO argues that the district court erred in failing to find that Deutsche Bank obtained notice of claims to the CBL Account on the day the account was opened. In any event, SECO asserts that other events occurring prior to August 1999 served to put Deutsche Bank on notice of adverse claims to securities held in the CBL Account.
 
 
 44
 (i) Opening of the CBL Account / Confiscation of the DCH Shares
 
 
 45
 SECO contends that Deutsche Bank was willfully blind to the adverse interests in the CBL securities from the first day CBL opened an account with Deutsche Bank. SECO argues that, since Houben believed from the outset that the CBL securities were owned by Blech and/or his family, see id. at 250-51, Deutsche Bank acted with willful blindness by permitting CBL to margin those securities without verifying that CBL had been given authority from the Blech family to do so, see id. at 267. We disagree.
 
 
 46
 Even if Houben had known that individuals other than Blech possessed interests in the CBL securities, it does not follow that such interests were likely to be adverse to CBL's interests. See U.C.C. § 8-105 cmt. 2 ("[A]wareness that someone other than the transferor has a property interest is not notice of an adverse claim. The transferee must be aware that the transfer violates the other party's interest."). Houben explained that ownership of stock in the name of a third party is not necessarily suspicious because it can occur when securities are transferred as a gift or through "other transactions that obviously are outside the sphere of influence of Deutsche Bank's broker-dealer." Credit Bancorp VI, 279 F.Supp.2d at 267 (internal quotation marks omitted). Thus, the district court properly concluded that Houben was not on notice of suspicious circumstances when the CBL Account was opened.
 
 
 47
 Similarly, the events leading to the confiscation of the DCH shares surely put Deutsche Bank on notice of a third party's interest in those shares — Deutsche Bank had been told that the shares were restricted when they were deposited on behalf of CBL; CBL sought to re-issue the shares in Oxford's name, not CBL's; and none of the parties disagreed as to whether the DCH shares should be confiscated. Id. However, rather than establishing proof of the existence of adverse claims, the confiscation of the DCH shares barred an adverse claim from arising. Based on the facts, the district court reasonably accepted Deutsche Bank's view that the circumstances surrounding the confiscation suggested "some sort of transaction involving the DCH shares had occurred between CBL and Oxford and that there was either confusion or possibly a dispute relating to payment for the shares." Id. at 266-67 (internal quotation marks omitted). Thus, despite SECO's assertions, there was no indication at this stage that CBL attempted to act in a manner adverse to another party's interest.
 
 
 48
 (ii) Blech and Praegitzer Letters
 
 
 49
 The Blech Letter informed Deutsche Bank of incoming Praegitzer shares. The Praegitzer Letter informed Deutsche Bank that the shares were restricted. Deutsche Bank deposited the Praegitzer shares in CBL's Margin Account. Taken together, the Blech and Praegitzer Letters could be used to establish suspicions that an adverse claim to the 200,000 Praegitzer shares existed. However, Deutsche Bank denies receipt of the Praegitzer Letter and SECO cannot establish that it was sent. Id. at 253, 268. Similarly, there is no evidence to establish that Deutsche Bank deliberately prevented transmission of the Praegitzer Letter. Thus, we cannot conclude that Deutsche Bank was on notice of adverse claims to the Praegitzer shares at this stage in its dealings with CBL. See id. at 268 ("In the absence of evidence that the parties conducting the CBL transactions either saw or knew of the Praegitzer Letter, notice of an adverse claim cannot be charged to those individuals.").
 
 
 50
 (B) Post-August 1999
 
 
 51
 Deutsche Bank argues that the district court erred (a) in finding that the WWW press releases and lawsuits established sufficient facts to indicate a significant probability of an adverse claim and (b) that Houben deliberately avoided information that would have established the existence of an adverse claim.
 
 
 52
 (i) WWW Letter
 
 
 53
 As with the Praegitzer Letter, the WWW Letter, dated August 11, 1999, would likely have been sufficient to arouse suspicion of adverse claims to the WWW shares. Yet, as with the Praegitzer shares, the parties are unable to establish that Houben or Hoddinott saw the WWW Letter. Caffrey was clearly an inappropriate recipient of this fax — he worked on a trading desk that dealt in the purchase and sale of public securities; he had never heard of CBL and he did not work with Houben, who was stationed on another continent. Id. at 256. Caffrey testified that if he received a letter outside the scope of his work, he would not bother forwarding it to the appropriate person. Id. Caffrey did not recall receiving the WWW Letter, nor is there any evidence that the letter was forwarded within Deutsche Bank. Id. at 268-69. Moreover, there is no evidence that Deutsche Bank deliberately prevented the WWW Letter from being sent to appropriate personnel. Id. at 269. While Deutsche Bank, perhaps, should have initiated better internal compliance measures, such a failure does not amount to deliberate avoidance. See U.C.C. § 8-105 cmt. 4 ("The question is whether the person deliberately failed to seek further information because of concern that suspicions would be confirmed.").
 
 
 54
 (ii) WWW Press Releases
 
 
 55
 The district court concluded that there was uncontroverted evidence that Houben saw both WWW press releases, and that the allegations of short selling in violation of the CFA and the Trust Agreement provided sufficient notice to Deutsche Bank that WWW likely possessed an adverse claim to the WWW shares. Credit Bancorp VI, 279 F.Supp.2d at 269, 271. The district court further concluded that, despite Houben's awareness of these facts, he "`deliberately avoid[ed] information that would establish the existence of the adverse claim.'" Id. at 270 (quoting U.C.C. § 8-105(a)(2)).
 
 
 56
 (a) Houben's Awareness of Facts
 
 
 57
 The August 10 press release stated that CBL's WWW stock was pledged as collateral for a loan by CBL to WWW and that the CFA and Trust Agreement did not authorize the short selling of WWW stock. The August 26 press release stated that Douglas Brandon, acting as trustee of the WWW shares, was required to inform any broker-dealer receiving the WWW shares that the shares were bound by the restrictions of Rule 144 and were held by CBL merely as collateral for a loan. The press release further explained that a suit by a WWW shareholder sought to rescind the CFA and compel the return of the pledged WWW shares.
 
 
 58
 On appeal, Deutsche Bank argues that the district court misapplied the method used to determine notice of an adverse claim because it failed to recognize the subjective nature of the test. Under the Code, the notice standard "tak[es] account of the experience and position of the person in question." U.C.C. § 8-105 cmt. 4.[12] Deutsche Bank argues that the press releases could not have put Houben on notice of an adverse claim to the WWW shares because the shares referenced in the press releases did not resemble the WWW shares in the CBL Account: the shares in the CBL Account were not shorted, and the share certificates presented to Deutsche Bank showed unrestricted shares owned by CBL.[13]
 
 
 59
 The record, however, establishes that Houben understood that the press releases referred to the WWW shares held in the CBL Account. Houben called Blech about the August 10 press release on the day of its issuance. Following WWW's issuance of the August 26 press release, Houben asked Blech how the WWW shares could have been restricted when Deutsche Bank received them without any restrictions written on the certificates. Blech explained that the "restriction issue is between CBL and the counterparty." Credit Bancorp VI, 279 F.Supp.2d at 257 (internal quotation marks omitted).
 
 
 60
 Irrespective of these calls, the facts establish that Houben, an experienced broker, would have been aware of the significant probability of an adverse claim to the shares Deutsche Bank held for CBL, even though the press releases did not specifically claim that Deutsche Bank held the referenced WWW shares. According to Blech, Houben shorted WWW shares on behalf of CBL, and the press releases charged that CBL shares were impermissibly shorted. The press releases asserted that WWW pledged its shares to CBL only as collateral for a loan, yet Houben knew that CBL pledged unrestricted WWW shares as collateral for its Margin Account. Blech had told Houben that the sales of WWW shares were designed to fund a loan to a WWW shareholder.
 
 
 61
 Finally, the chronology of events suggests that Houben understood that the August 10 press release referred to the WWW shares held by Deutsche Bank. On July 29, 1999, CBL deposited 2.65 million WWW shares into the CBL Account. Complaining about the negative effect short selling caused on WWW's share price, the August 10 press release referenced a statement allegedly made by CBL that the short-selling began on August 4 and would cease on August 11. The evidence showed that CBL sold 100,000 WWW shares on August 5, another 100,000 shares on August 6, and 75,000 shares on August 9. Credit Bancorp VI, 279 F.Supp.2d at 255.
 
 
 62
 In light of the evidence as to Houben's experience in the financial services industry and the allegations in the press releases, we see no clear error in the district court's implicit finding that Houben was aware of a significant probability that WWW possessed an adverse claim to WWW shares indirectly held by CBL through its accounts with brokerage firms. See, e.g., id. at 270 ("Houben's disclaimer of knowledge lacks credibility.... Houben was certainly aware of facts sufficient to indicate that there [wa]s a significant probability that an adverse claim exist[ed]") (internal quotation marks omitted). As the district court noted, "The mere allegation by WWW of the existence of a CFA between WWW and CBL is enough to create suspicion about adverse claims to the WWW shares, as Blech has testified that he never discussed with Houben the existence of the CFAs by which CBL obtained the securities it deposited at Deutsche Bank, let alone the terms of those agreements." Id. at 270 n. 8.
 
 
 63
 (b) Houben's Deliberate Avoidance
 
 
 64
 At the district court, Deutsche Bank claimed that Houben properly investigated WWW's allegations by calling Blech after issuance of the press releases, and that Houben reasonably concluded that no adverse claims existed after obtaining assurances from Blech. Id. at 270. The evidence was also sufficient to support the district court's finding that Houben "deliberately avoided information that would establish the existence of the adverse claim." Id. (internal quotation marks and brackets omitted). The record supports the court's conclusion that by deliberately failing to examine the CFA and the Trust Agreement — the documents that were the subject of the dispute between CBL and WWW — Houben remained willfully blind of adverse claims to the WWW stock Deutsche Bank held in the Margin Account. Id.
 
 
 65
 According to Deutsche Bank, the proper test is whether Houben "deliberately closed [his] eyes to some easily obtained information" or exhibited "subjective bad faith and dishonesty." Appellant's Br. at 27 (quoting SEC v. Lehman Bros., Inc., 157 F.3d 2 (1st Cir.1998)). Since the district court found that Houben contacted Blech after both press releases to obtain CBL's response to the allegations, Deutsche Bank argues that the district court transformed the "deliberate avoidance" prong of willful blindness into an "enhanced," "two-tiered investigation" in which information obtained must be "confirmed" through "further information." Id. at 28. We disagree. The district court required that Houben look to easily obtainable authoritative sources — here, the CFA and Trust Agreement — to determine whether the allegations against CBL had merit. In doing so, the district court did not impose an enhanced duty on Houben. Rather, the court required that Houben refrain from deliberately avoiding easily accessible information that would have determined whether the adverse interests to CBL's securities alleged in the press releases were valid.
 
 
 66
 The deliberate avoidance test asks "whether the person deliberately failed to seek further information because of concern that suspicions would be confirmed." U.C.C. § 8-105 cmt. 4. The district court properly concluded that it was not sufficient for Houben, an experienced broker, to seek assurances from Blech, an individual named in the August 26 press release. Credit Bancorp VI, 279 F.Supp.2d at 273. As the district court noted, "[t]he mere allegation by WWW of the existence of a CFA between WWW and CBL is enough to create suspicion about adverse claims to the WWW shares," id. at 270 n. 8, since Houben believed that CBL possessed only assets from Richard Blech or the Blech family. Houben should have examined the CFA and Trust Agreement when confronted with the press release allegations. Id. at 270. In light of the allegations contained in the press releases, the district court correctly concluded, "The conduct alleged by WWW is so far afield of the image of CBL that Blech had created for Houben that it was incumbent upon Houben to seek some kind of confirmation outside of CBL that the claims made by WWW were baseless." Id. If Houben had examined the CFA and Trust Agreement when confronted with WWW's allegations, he would have learned of the truth of those allegations, which would have established further proof of adverse claims to CBL's remaining holdings. In light of the obvious need to review these documents, we see no error in the court's finding that Houben deliberately avoided this information "from the time that Houben failed to seek confirmation of Blech's oral assurances that there was nothing to be concerned about regarding the WWW shares." Id. at 271.
 
 2. Effect of Notice on All Other CBL Shares
 
 67
 Deutsche Bank argues that even if the WWW press releases served as notice of adverse claims to the WWW shares, that notice did not trigger a duty to inquire into the status of other stocks in the Margin Account and the Tasin Account. We agree with the district court that the allegations in the WWW press releases suggested serious and widespread corruption in the Margin and Tasin Accounts. In light of the press releases and the lawsuits referenced therein, the confiscation of the DCH shares could no longer be viewed as an isolated incident. Taken together, these events raised serious questions as to whether any CBL securities were Blech family-owned assets. Given the requirements under the Code that a person aware of facts sufficient to indicate a significant probability of an adverse claim may not avoid information that would establish the existence of that claim, we see no error in finding that Houben, a sophisticated broker intimately involved with CBL and fully aware of the allegations against the company, failed to fulfill his duty not to avoid information when he accepted Blech's response. Houben should have reviewed the CFA to develop an understanding of the true nature of CBL's interests. Indeed, even without knowledge of the WWW press releases, Deutsche Bank's legal department found the information in the CFA so questionable that it circulated copies of the CFA to several in-house lawyers for their consideration. Id. at 258-59. If Houben had checked the CFA and learned of CBL's scheme, he would have become aware of the significant likelihood that CBL obtained all of its securities through its Ponzi scheme. "By not undertaking any inquiries apart from two phone calls to Blech, Houben thereby put Deutsche Bank on notice of an adverse claim to all securities after Blech and Houben spoke regarding the first WWW press release." Id. at 273.
 
 3. Pre-Notice Versus Post-Notice Collateral
 
 68
 We do not find merit in Deutsche Bank's contention that security interests in collateral obtained pre-notice remain unaffected by subsequent notice, even when such notice is obtained prior to additional loans. At the district court, Deutsche Bank sought a declaratory judgment with respect to the Vintage Shares based on the claim that it obtained the Vintage Shares without notice, while the Receiver and SECO asserted adverse claims to the Vintage Shares, arguing that Deutsche Bank was on notice of adverse claims to all securities in the CBL Account. Id. at 271-74.
 
 
 69
 Here, the district court properly concluded that Deutsche Bank obtained a primary security interest on CBL's property each time Deutsche Bank extended pre-notice credit to CBL through a margin loan collateralized by a basket of CBL securities. Id. at 274-75. CBL's mere decision to deposit securities as collateral for future loans did not establish Deutsche Bank's interest in those securities. A security interest arose only after the first loan was issued, and the interest then increased with each subsequent loan. In the "common case where the financial intermediary ... both holds the account of the debtor and will be the secured creditor[,] .... under the provisions of 8-313(1)(j) a security interest would spring into existence on the giving of value." 4 James J. White & Robert S. Summers, Uniform Commercial Code § 31-12(c), at 165-66 (4th ed.1995). Thus, we would defenestrate the willful blindness prong of the notice provisions of § 8-105(a) if we accepted Deutsche Bank's argument that its interest in the Vintage Shares, a "security entitlement" under the Code, became unassailable the moment it received the shares, regardless of when it issued the loans. Under Deutsche Bank's view, a lender would be insulated from any facts that could lead it to believe that its security interest in subsequent loans might be in question. We cannot agree. Once Deutsche Bank had notice of potential adverse claims to all of CBL's securities — which the district court found dated "from the time that Houben failed to seek confirmation of Blech's oral assurances that there was nothing to be concerned about regarding the WWW shares," Credit Bancorp VI, 279 F.Supp.2d at 271 — Deutsche Bank was thenceforth precluded from asserting the protection of § 8-510 on future loans.
 
 
 70
 As the district court noted, our view is supported by analogy to those provisions of U.C.C. Article 9 concerning future advances and the rights of parties under security agreements. Id. A "future advance" is defined as "money secured by an original security agreement even though it is lent after the security interest has attached." Id. at n. 10 (quoting Black's Law Dictionary 685 (7th ed.1999)). A secured lender of a future advance is protected from adverse claims to its collateral if the lender provides the advance without notice of a lien on the collateral. See U.C.C. § 9-323(b). A secured party must "check to determine whether a lien has been filed against his debtor before the secured party makes his advance. If a lien has been filed, the secured party obviously should not make the advance...." 8 W. Hawkland Uniform Commercial Code Series § 9-204:5 (2003) (describing U.C.C. § 9-301(4), which is § 9-323(b)'s predecessor). Although provisions describing the rights and duties of a secured party in Article 9 are often inapplicable to Article 8 since Article 8 does not generally impose on secured parties a duty to investigate, the analogy seems appropriate in this case because Deutsche Bank incurred a duty to avail itself of relevant facts once it learned of suspicious circumstances suggesting the existence of adverse claims.
 
 III. Conclusion
 
 71
 In sum, where, as here, there is an adverse claim to a particular stock held in a lender's basket of collateral, and the lender ignores circumstances strongly suggesting the likelihood that such claim exists as to that stock and other stocks, and thereafter extends a loan to its client without investigating the suspicious circumstances, that subsequent loan is not secured by the stocks that were, and that the lender should have suspected were, subject to adverse claims. We note that we do not adopt the district court's suggestion that any claim as to one stock automatically contaminates other stocks in the basket as potential collateral, see Credit Bancorp VI, 279 F.Supp.2d at 274, or its suggestion that "[h]ad Deutsche Bank acted properly," it "almost certainly would not have extended further credit to CBL because it could no longer be assured that it could properly sell the securities CBL attempted to pledge as collateral," id. There may well be cases where the nature of a loan transaction and the notice of an adverse claim to one stock will not give a lender any reason to believe that other securities held in a margin account may be subject to adverse claims. This, however, is not such a case.[14]
 
 
 72
 For the foregoing reasons, we AFFIRM the district court's order in all respects.
 
 
 
 Notes:
 
 
 [1]
 A Ponzi scheme is one in which investor profits are manufactured from newly-attracted investment principal rather than through the success of the underlying business venture, creating a self-perpetuating cycle of fraud. Essentially, investors are drawn by the promise of high returns, but the scheming entity can pay those returns only for so long as it continues to attract further investmentSee, e.g., In re Churchill Mortgage Inv. Corp., 256 B.R. 664, 667 n. 2 (Bankr.S.D.N.Y.2000).
 
 
 [2]
 For the purposes of this Opinion, Deutsche Bank Securities, Inc. and DB Alex Brown LLC ("DBAB") are collectively referred to as "Deutsche Bank."
 
 
 [3]
 At the time, Houben was a broker with BT Alex. Brown ("BTAB"), Deutsche Bank's predecessorId.
 
 
 [4]
 New York's U.C.C. applies to the CBL Margin Account and Maryland's U.C.C. applies to the Tasin Account. Since all relevant provisions of both state codes are identical, this Opinion omits reference to either state
 
 
 [5]
 Houben was the broker for the CBL Account and Tasin & Co. was the broker for the Tasin AccountId.
 
 
 [6]
 Although the meaning of "Restricted" was not explicit on the face of the certificates, the district court understood the "Restricted" mark to signify that the securities were restricted by SEC Rule 144, 17 C.F.R. § 230.144Id. A holder of securities restricted under Rule 144 must meet certain conditions before he may sell them. These conditions include a minimum holding period and limitations on the amount of securities that may be sold and the manner of the sale. Id. at 251 n. 3. On appeal, the parties do not disagree with the district court's interpretation that the "Restricted" mark referred to Rule 144 restrictions.
 
 
 [7]
 Deutsche Bank did not produce the Praegitzer Letter and asserted that it was not in its filesId. at 253, 268.
 
 
 [8]
 With certain exceptions, restricted shares were not eligible for electronic transfer in the summer of 1999Id. at 253-54.
 
 
 [9]
 In a "short sale," an investor sells stock that he does not yet own by borrowing that stock from a broker and warranting that he will "cover" the sale by purchasing that stock at a later date. In this speculative investment, the investor will earn money if the stock price is lower at the time of purchase than at the time of sale and the investor will lose money if the purchase price is higher than was the sale priceSee Levitin v. PaineWebber, Inc., 159 F.3d 698, 700 (2d Cir.1998) (describing short sales).
 
 
 [10]
 This Court reviews the district court's factual findings for clear error, and reviews the district court's conclusions of lawde novo. See FDIC v. Providence College, 115 F.3d 136, 140 (2d Cir.1997).
 
 
 [11]
 SECO names several other Deutsche Bank employees who worked with Houben and asserts that they should be included in this analysis. Since there are no allegations that these other employees did not or would not have funneled information to Houben, the broker responsible for the account, there is no need to include them in the analysis. In any event, there is no indication that these individuals possessed information that would alter the inquiry in any way
 
 
 [12]
 Deutsche Bank also attempts to distinguish the allegations made in WWW's press releases as words to which willful blindness cannot attach because prong one of the willful blindness test requires awareness of facts, not merely allegations, that make an individual aware of the significant probability of the existence of an adverse claim. This argument need not be examined other than to note that the "facts" of which Houben was aware included the fact that credible allegations against CBL had been made
 
 
 [13]
 Blech testified that Houben sold WWW stock for him. If Deutsche Bank's claim is true, then the CBL sales of WWW stock must have occurred with respect to the Tasin Account
 
 
 [14]
 We have considered the parties' remaining arguments in support of their respective appeals and have found them to be without merit